[No. A089492. First Dist., Div. Four. Mar. 6, 2002.]

WILLIAM WEST, Plaintiff and Respondent, v.
BECHTEL CORPORATION, Defendant and Appellant.

COUNSEL

Thelen Reid & Priest, Michael C. Hallerud, Thomas M. McInerney and Julie L. Maibach for Defendant and Appellant.

Law Offices of Ruel Walker, W. Ruel Walker; Goldstein, Gellman, Melbostad, Gibson & Harris and R. Stephen Goldstein for Plaintiff and Respondent.

OPINION

KAY, P. J.—Defendant Bechtel Corporation appeals from a judgment for plaintiff William West and from the order denying its motion for judgment notwithstanding the verdict after a jury trial of West's claims of breach of an employment contract, and employment discrimination based on age in violation of the California Fair Employment and Housing Act (Gov. Code, § 12940 et seq.; FEHA). We reverse and direct entry of judgment for Bechtel Corporation.

## I. BACKGROUND

West is an engineer who worked his entire career for Bechtel-affiliated companies. "Bechtel" is a trademark of an organization of about 150 engineering and construction companies, which is headquartered in San Francisco and operates worldwide (hereafter Bechtel). Bechtel maintains a universal database for employees around the world called the Human Resources Information System, or HRIS. All Bechtel affiliates have access to the HRIS, which can be used to put together project teams on short notice. The HRIS tracks continuous service with Bechtel, and employees are given mementos such as plaques to commemorate, as Bechtel's human resources manager Patrick Morgan put it at trial, years of service with "the company."

West received a letter from a Bechtel vice-president acknowledging the 30th anniversary of his employment in August 1994. West had many overseas assignments during his career with Bechtel, all of which were counted toward his total years of service. Bechtel, a principal operating company in the group, has a policy against retaining employees residing in foreign countries to avoid subjecting itself to foreign laws and taxes. Accordingly, West was employed by other Bechtel entities during his overseas assignments, such as Bechtel Pacific when he worked in Australia, and Bechtel Chile when he worked in that country. However, West testified that he always regarded himself as an employee of Bechtel.

West said that he was frequently pulled off one job and moved to another; for example, he was transferred from Chile to Australia at one point at the

request of Bill O'Rourke of Bechtel Mining & Minerals in San Francisco. West commonly worked on smaller projects in between longer assignments. If no smaller projects were available, he was placed on "holding status" for up to 90 days, where he continued to receive group insurance and benefits, and retained continuous service eligibility. Except for a two-month period in 1985, West was steadily employed on long-term assignments or short-term projects throughout his career.

West had completed an assignment for Bechtel in New Orleans and was working under O'Rourke in San Francisco on short-term projects for Bechtel in September 1997 when he was approached by Almin Almuti, an employee of Bechtel Infrastructure, Inc., about a position as manager of engineering on the Jubail Project in Saudi Arabia. The Jubail Project, described in Bechtel literature as "the largest single industrialization program ever," involved construction and expansion of an industrial city begun in 1977, at a total installed cost over $40 billion. Work on the project was performed by Saudi Arabian Bechtel Company (SABCO), a Saudi Arabia limited liability company owned by a Saudi entity and a Bechtel foreign subsidiary; the client was the Royal Commission for Jubail and Yanbu (Royal Commission), an organ of the Saudi government. Based on discussions with Almuti and Norm Shotwell, SABCO's project director on the Jubail Project, West understood that the position in Saudi Arabia would be for two years. West said that O'Rourke could not offer him any assignment of comparable duration; O'Rourke testified that there was a downturn in the market at the time. West decided to accept the Jubail position, with the intention of retiring in California when it was completed. He thought of the position as the final "jewel" in the "crown" of a successful career, and anticipated earning $240,000 after taxes and expenses during the two-year period.

West signed a document dated October 27, 1997, entitled "Recital of International Employment Conditions" (Recital), providing for his arrival in Saudi Arabia by October 31, 1997. The Recital stated: "Your assignment is for an indefinite period; and, assuming your performance is satisfactory, the assignment will continue until Bechtel advises you that your services are no longer required, in which event you will be given a minimum of four weeks written notice of assignment completion." The Recital was signed as having been prepared by William Gilham, a Bechtel employee. SABCO human resources manager Anwar Al-Saeed testified that Gilham prepared the Recital at his direction, as SABCO's representative.

Attached to the Recital were SABCO's "International Employment Conditions" for the Jubail Project, which together with "other published Bechtel

personnel policies represent policy applicable to the assignment within Saudi Arabia." The Jubail conditions provided that "[w]here they differ from published Bechtel policies, they supersede such policies. Except for these differences, standard Bechtel International Policies will apply." Under Bechtel's standard international employment conditions, "[a]ssignments are permanent when employees are directed to work at an international location and the assignment is normally expected to exceed nine months," and the Jubail conditions stated that "[e]mployees on permanent international assignment are employed by [SABCO]." Al-Saeed acknowledged that the "standard Bechtel International Policies" cited in the Jubail conditions referred to policies promulgated by "Bechtel all over the world. Bechtel Corp.," rather than SABCO.

An HRIS "Employee Status Notice" was completed reflecting West's transfer from Bechtel in San Francisco to SABCO in Jubail, Saudi Arabia. The HRIS document showed that, incident to the transfer, West was paid for his accrued vacation and sick leave with Bechtel.

Under its contract with SABCO, the Royal Commission retained "the right in its absolute discretion to reject or require the removal or replacement of personnel at any level assigned to provide Services" under the agreement. West acknowledged that all of his overseas assignments, including the one with SABCO, were contingent on his acceptability to the clients for whom the work was done.

SABCO project director Shotwell executed a "Resume Summary" listing West's qualifications and submitted it to the Royal Commission. The director general of the Royal Commission, Dr. Jasem Al-Ansari, signed the Resume Summary approving West's retention. Although the document disclosed that West was 62 years old, West testified that when he arrived in Saudi Arabia and met Shotwell on November 1, 1997, Shotwell immediately remarked that West was going to have a problem because his gray hair showed that he was over age 50, and people over 50 "were regarded with suspicion." West testified in his deposition that he understood Shotwell's remark to refer to perceptions of the Royal Commission.

West received a memo dated November 30, 1997, signed by Shotwell and Hassan Al-Saeed, director of engineering and West's counterpart in the Royal Commission's engineering department, requesting that West work on December 24 and 31, 1997, and reschedule his holidays on those dates. Consistent with that memo, SABCO's Anwar Al-Saeed testified that as of November 30, 1997, SABCO had no intention of terminating West. However, in another memo on that date, to Shotwell from Jasim Al-Hejji, deputy

director of the Royal Commission and second in command to Dr. Al-Ansari, Shotwell was directed to fire West. Al-Hejji's memo read in full: "This is to serve as a formal notice to Saudi Arabian Bechtel Company (SABCO) that the Royal Commission has decided that Mr. William West does not satisfy our requirements as Engineering Manager, and should be replaced as soon as possible. Also, that Mr. West should depart the project before further settling in costs are incurred."

West wrote in his diary: "3:00 pm on Tuesday Dec 9 following staff meeting. Shotwell informed me of Jasim's decision to terminate me. Reason given was my age and lack of display of energy. Shotwell claimed that there was no recourse and that [Hejji] had full support of D.G. [Director General Al-Ansari]. Shotwell offered help [with] next [assignment] (Korea) . . . [¶] . . . [¶] Decided to accept [Hejji]/Shotwell decision! [¶] [Hejji] entitled to opinion, I do not have to agree with his opinions. Evening of Wed Dec 10 Shotwell enquired if I had spoken with [Hejji]. Replied that I saw no benefit in this as I would be liable to react with a remark that I or Bechtel would later regret."

West testified on direct examination that Shotwell advised him that his age was "unacceptable," that Shotwell said he should make plans to return to San Francisco as soon as possible, and that he held Shotwell and Bechtel responsible for the dismissal from his position. West was then cross-examined at length about his conversation with Shotwell when he was fired. The questioning began with the following exchange: "Q. When Mr. Shotwell had this conversation with you, did he tell you that he personally felt that your age was an impediment to your performing satisfactorily at SABCO? [¶] A. Yes. [¶] Q. He told you that was his personal opinion? [¶] A. He was the only one present. It had to be his opinion." Shortly thereafter, West stated that Shotwell "did mention that the Royal Commission was the source of the complaint." Then, on re-direct, West said that he did not "know specifically" where Shotwell got the idea that he was too old, and that from his standpoint the source of the complaint did not really matter.

Cross-examination on the subject resumed when West was called as a witness in Bechtel's case. He was asked to read the following statement in the charge of discrimination he lodged with EEOC (Equal Employment Opportunity Commission): "My Director, Norman Shotwell, told me that I was not acceptable to the Saudi Arabian clients because I was over fifty years of age and they were suspicious of anybody over fifty." "Q. So Mr. Shotwell told you that the Royal Commission was suspicious of persons over fifty, correct? [¶] A. That was the way it was explained when he told me I was unacceptably old for the job. [¶] Q. Unacceptably old to the Royal

Commission? [¶] Yes or no, please? [¶] A. Yes." West's deposition testimony, read into the record, was that Shotwell said that the director general of the Royal Commission had made the decision to fire him. "Norm Shotwell asked me to accept the decision," West said, "He was given a direction by the Royal Commission and he passed that directly to me without any effort to say, 'Wait a minute, why don't you give the fellow a chance to prove himself?' "

When asked at his deposition who had discriminated against him because of his age, West answered, "I point the finger directly at Norm Shotwell. And if it was not his decision, I'm very disappointed that he did not have the backbone to go to my support. I would have done that in a similar situation." West testified at trial that he was angry that Shotwell had "adopted the Royal Commission's opinion," and upset with Shotwell because "I felt that he should have been more supportive of me. He had sold my talents to the Royal Commission and somebody in the Royal Commission had turned against me for what I was told was age. And I felt that if I had been in Norm Shotwell's position, that I would have gone back to the Royal Commission and asked for them to give me more chance to prove myself capable of handling the job."

West searched his memory for reasons, apart from his age, for the director general's dissatisfaction with him, and thought that the problem might have resulted from his failure to recognize the director general at a social function, or from a dispute about the materials to use for road construction. Shotwell offered to set up a meeting between West and the Royal Commission to discuss the reasons for West's removal, and Royal Commission engineer Hassan Al-Saeed offered to intercede with the Royal Commission on West's behalf. West said that he rejected these offers because he believed it would be futile to try to reverse the Royal Commission's decision, and that talking to them would not change their minds. West told Hassan Al-Saeed that he felt "the damage had been done. If that was the opinion of the [D]irector [G]eneral, then who was I to dispute . . . his opinion." West said that his subordinates learned of the Director General's decision to fire him "fairly promptly" after the decision was made, and thus that "my feet had been cut from underneath me. I had no—I felt I had no more respect from the people that reported to me."

Thus, West acceded to his dismissal. "Q. And, instead [of appealing to the Royal Commission], you decided to call it quits in Saudi Arabia and go back to Bechtel Corporation San Francisco because you knew, as they had for 33 years, that they would find you another job. Correct? [¶] A. Correct." In any event, West admitted that he had no choice but to leave Saudi Arabia if the

Royal Commission did not want him there because he needed a work permit from the Saudi government to maintain his employment with SABCO.

Shotwell noted that West was entitled under the Recital to four weeks' notice of completion of his assignment, but they jointly agreed that he should return sooner, and he left for San Francisco on December 22, 1997. Despite having been put in what he called "a very humiliating position," West continued to perform his duties as manager of engineering on the Jubail Project prior to his departure. West signed a "Letter of Acquittance" acknowledging receipt of his salary from SABCO to December 21, 1997, and releasing SABCO from liability. He was treated as if he had completed his assignment rather than been fired for cause, and thus did not have to pay the cost of his return trip.

Although West expected that Bechtel would find employment for him when he returned from Saudi Arabia, he was at that point, in his wife's words, "a broken man." Ella Bennett, a family friend who had known the Wests for many years, said that before West left for Saudi Arabia he was the "life and soul of a party," but seemed introverted and irritable after he returned. West never sought any treatment for his mental health, but Mrs. West said that he was depressed and had days when he did not want to get out of bed. West said that his wife was critical of him for "crawl[ing] under a rock the way that [he] ha[d] reacted" to his experience in Saudi Arabia. West said that he lost self-esteem and confidence as a result of that experience, and thus did not accept any of the offers he received for work with Bechtel after he returned. He said that in light of "[m]y experience in Saudi Arabia having been thrown on the garbage heap and being told I was too old, I didn't feel I could properly represent the company as I had done in the past. And I felt also that Bechtel, having displayed that behavior in Saudi Arabia, may repeat it."

West conceded that he never felt discriminated against by anyone at Bechtel other than Shotwell, and that he received numerous employment offers with Bechtel after returning from Saudi Arabia. West agreed that he had been "welcomed back" by Bechtel. West was asked: "From all the circumstances that occurred after your return from Saudi Arabia, you were convinced that Bechtel Corporation did not want you to leave the company, isn't that correct?" He answered: "Yes. I was flattered by the offers made to me."

William Imrie of Bechtel's mining and metals division, and Bechtel engineering manager Les Chang were West's "functional supervisor[s]" when he returned to San Francisco in December 1997; West testified that

from the time of his return to the time he retired in July 1998 Chang called him frequently about potential positions, and he received various short-term offers from Imrie and others. West said, "My answer has been consistently that I felt so upset by what had happened in Saudi Arabia that I didn't feel that I could perform to my previous standards."

In the week after West arrived in San Francisco, Imrie offered him a two-to-three-week assignment in Argentina. West said he assumed that this assignment would have matched his qualifications, and that it would have been at his former Bechtel salary. In February 1998 West was offered a two-year position in Chile, which would have paid him about the same amount as his assignment in Saudi Arabia. When West indicated that he was not interested in any more overseas assignments, Bechtel project manager O'Rourke suggested that he consider part-time work out of his home.

In April 1998, O'Rourke approached West about performing a one-month study on the Antamina Project in Peru, which was then in the planning stages. West was slated to be an engineer on this project; Bechtel was awarded the contract in September 1998. West's position would have been in San Francisco, at his previous Bechtel salary without the additional hardship and cost of living allowances for foreign work, and would have extended through the fourth quarter of the year 2000. West said he turned down the position on the Antamina Project because it would have involved at least one visit to the project site, which was at an altitude of 14,500 feet, based on medical advice that he avoid such elevations. O'Rourke testified that Bechtel would have accommodated West's medical condition, and that the condition would not have disqualified West from the project.

When West returned from Saudi Arabia he requested a leave of absence to consider his options; instead, he was offered and accepted holding status, where he continued to receive insurance and benefits with the expectation that he would return to work. Holding status normally lasts only 90 days, but West's holding status was extended an additional 90 days, to July 1998. West applied for and received unemployment benefits, which expired in July 1998.

On June 30, 1998, Imrie wrote a letter to West recounting the employment offers West had rejected after returning from Saudi Arabia, noting that West had been speaking of retirement, and asking him to confirm his intentions. "For our selfish reasons," Imrie wrote, "I hope you do not retire at this moment, but instead decide to accept the job assignments being offered to you."

West decided to retire effective July 8, 1998. He had determined in January 1998 that he had a net worth in excess of $1.9 million. He filed a declaration in this case stating that he had decided to retire in January 1998, but testified at trial that he had only decided that he could afford to retire at that point.

West said that he decided to sue Bechtel in February 1998; that month, he filed a complaint with the California Department of Fair Employment and Housing and the discrimination charge with the EEOC. West said he understood from his son, who had recently passed the bar examination, that he could sue Bechtel even if he turned down its job offers.

West acknowledged that he never looked for work after he returned from Saudi Arabia. He said that after he retired he continued to receive inquiries from Bechtel about possible employment, and admitted at trial in June of 1999 that he could be working for Bechtel "today" if he wanted to.

West originally filed suit against SABCO as well as Bechtel, but dismissed that suit, and proceeded in the present case against Bechtel alone. The complaint herein asserted 12 causes of action, but only the age discrimination and breach of contract claims were eventually tried to the jury. The jury deliberated over the course of six days, and twice reported being at an impasse, before rendering its special verdicts.

In its special verdict on the discrimination claim, the jury found that: (1) West was an employee of Bechtel when he was on assignment in Saudi Arabia; (2) Bechtel or one of its agents removed West from his position as manager of engineering at the Jubail Project; (3) age was a motivating factor in Bechtel's decision to remove West from his position; (4) West's removal caused him emotional distress; (5) his damages for emotional distress were $50,000; and (6) his lost salary to October 29, 1999, as a result of the discrimination was $100,000.

The special verdict on the breach of contract claim found that: (1) West had a contract with Bechtel for his Jubail Project assignment; (2) the contract was for two years, rather than for an indefinite period; (3) Bechtel breached the contract; (4) West's lost salary to October 29, 1999, as a result of the breach, without reduction for damages awarded on the age discrimination count, was $216,852.27; and (5) West through reasonable efforts could have earned $165,000 by comparable employment.

Judgment was entered for West in the amount of $101,852.27, representing lost salary of $51,852.27 ($216,852.27 minus $165,000) plus $50,000 for

emotional distress. Bechtel's motions for new trial and for judgment notwithstanding the verdict were denied, and this appeal ensued.

## II. DISCUSSION

### A. *Age Discrimination*

Bechtel raises a series of alternative arguments to overturn the verdict on the age discrimination count: (1) that the FEHA does not apply to acts and omissions in foreign countries, and thus does not cover the discrimination alleged here; (2) that there is no substantial evidence that Shotwell, a SABCO employee and the only one at Bechtel alleged to have discriminated against West, acted as Bechtel's agent in his dealings with West so as to subject Bechtel to liability; (3) that there is no substantial evidence of age discrimination on the part of Shotwell; and (4) that Bechtel had a defense to liability in any event because it proved that Shotwell had no choice but to terminate West when directed to do so by the Royal Commission. We find no substantial evidence of discrimination by Shotwell, and therefore do not reach the other arguments.

The FEHA provides: "It is an unlawful employment practice for an employer to refuse to hire or employ, or to discharge, dismiss, reduce, suspend, or demote, any individual over the age of 40 on the ground of age, except in cases where the law compels or provides for such action." (Gov. Code, § 12941, subd. (a).) ■ A discharge is not "on the ground of age" within the meaning of this prohibition unless age is a "motivating factor" in the decision. (See *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 198 [48 Cal.Rptr.2d 448]; BAJI Nos. 12.01, 12.01.1.) Thus, " 'an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision.' " (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 362 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) "[A]n employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004-1005 [67 Cal.Rptr.2d 483].)

■ Substantial evidence showed that the Royal Commission was biased against West because of his age, but that bias cannot be imputed to

Shotwell. This point was resolved in *Brownlee v. Lear Siegler Management Services Corp.* (10th Cir. 1994) 15 F.3d 976, on the same facts presented here. (See *Guz v. Bechtel National, Inc., supra,* 24 Cal.4th at p. 354 [application of California employment discrimination laws is guided by pertinent federal precedent].) In *Brownlee,* defendant Lear hired the plaintiffs to provide services to the Royal Saudi Air Force (RSAF) in Saudi Arabia. "Sometime after plaintiffs' arrival in-country, RSAF personnel insisted plaintiffs were unsuitable for their assigned duties—allegedly based on impermissible age considerations—and barred plaintiffs from their work stations. When efforts to dissuade the RSAF proved fruitless, Lear capitulated and terminated plaintiffs." (*Brownlee v. Lear Siegler Management Services Corp., supra,* 15 F.3d at p. 977.) Since the plaintiffs had no evidence that Lear intended to discriminate against them on the basis of age, their age discrimination suit "turn[ed] on whether the RSAF's alleged discriminatory intent may somehow be imputed to Lear." (*Ibid.*) The court concluded that it could not: "[W]e know of no authority for imputing a principal's *discriminatory intent* to an agent to make the agent liable for his otherwise neutral business decision. Similarly, while discriminatory practices of an agent may be imputed back to a principal to render the principal liable for its agent's statutory violations, [citations], we have found no authority for imputing statutory liability in the opposite direction, from a culpable principal to an innocent agent." (*Id.* at p. 978.)

*Brownlee*'s conclusion is persuasive where the principal is a foreign sovereign who is able to compel the employee's discharge and is not bound by antidiscrimination laws in its dealings with the employee. (See Rest.2d Agency, § 343 [an agent is not liable for committing a tort commanded by the principal if the agent is "exercising a privilege of the principal" or the principal "owes no duty or less than the normal duty of care to the person harmed"].) We note that Bechtel requested judicial notice below that Saudi Arabian employment law does not prohibit age discrimination, and West does not suggest that Saudi governmental entities such as the Royal Commission are bound by the FEHA in carrying out projects in Saudi Arabia. We note also that Shotwell had no choice but to relieve West of his duties on the Jubail Project at the insistence of the Royal Commission because West's presence in the country was contingent on the approval of the Saudi government. In these circumstances, following the client's wishes can rightly be regarded as a "neutral business decision." (*Brownlee v. Lear Siegler Management Services Corp., supra,* 15 F.3d at p. 978.)

West contends that *Brownlee* is distinguishable because the employer in that case attempted to dissuade the Saudis from their decision. However, nothing in the opinion suggests that this fact had any bearing on the holding.

To the contrary, the court rejected the plaintiffs' argument that " '[h]aving knowledge that your boss wants to discriminate and acquiescing in his discrimination (or failing to take available remedial action) makes the subordinate equally liable for the discrimination.' " (*Brownlee v. Lear Siegler Management Services Corp., supra,* 15 F.3d at p. 977.)

Accordingly, the issue is whether there was substantial evidence that Shotwell himself had a discriminatory animus toward West, or that his professed reason for terminating West—the Royal Commission's directive— was merely a pretext for a discriminatory decision. As West's counsel stated at trial, "[i]t's an essential element for us to prove some sort of personal animosity" on Shotwell's part. In deciding whether that showing was made, "we must resolve all conflicts in favor of the verdict, and indulge in all reasonable and legitimate inferences in order to uphold [it]." (*Caldwell v. Paramount Unified School Dist., supra,* 41 Cal.App.4th at p. 207.)

There is no evidence of any statement by Shotwell indicating that he personally thought West was too old for the job. Shotwell's remark after West arrived in Saudi Arabia that people over 50 were regarded with suspicion referred to perceptions of the Royal Commission. As for Shotwell's remarks when he fired West, it is apparent from all of the evidence— West's diary entries, West's deposition testimony introduced at trial, the whole of West's trial testimony, and West's EEOC claim—that Shotwell ascribed the concerns about West's age only to the Royal Commission. As it "was explained," West ultimately admitted, he was "[u]nacceptably old to the Royal Commission." There being no "direct evidence" of discrimination in the form of statements by Shotwell reflecting his own "explicit consideration" of West's age (*Price Waterhouse v. Hopkins* (1989) 490 U.S. 228, 275, 277 [109 S.Ct. 1775, 1803-1804, 1804-1805, 104 L.Ed.2d 268] (conc. opn. of O'Connor, J.)), we must consider whether there was any "inferential proof" that, despite Shotwell's comments, he was in fact personally motivated to terminate West because of West's age (*id.* at p. 270 [109 S.Ct. at p. 1801]).

Circumstantial evidence in this case militates against any such inference. If Shotwell were biased against West because of his age, then presumably he would not have hired West in the first place. ■ As Division Two of this appellate district recently observed in *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 809 [85 Cal.Rptr.2d 459], " 'where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive.' [Citations.] . . . 'One is quickly drawn to the realization that "[c]laims that employer animus

exists in termination but not in hiring seem irrational." From the standpoint of the putative discriminator, "[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." ' " The court noted that the passage of time would eventually attenuate this "same-actor presumption" (*id.* at p. 810), but found that the presumption still applied in that case even though five years had elapsed between the hiring and the firing at issue (*id.* at p. 809, fn. 7). While the presumption is not irrebutable (*id.* at p. 810), it applies with particular force here because Shotwell fired West scarcely more than a month after he hired him.

■ Also, if Shotwell had any intention of firing West before he received the Royal Commission's directive, then presumably he would not have been soliciting West's consent to future work on the very day that directive was sent. Taken together, the November 30, 1997 memos from Shotwell to West asking him to work on upcoming holidays, and from the Royal Commission to Shotwell ordering that West be immediately fired, strongly imply that Shotwell was not planning to terminate West before he received the order to do so.

No substantial evidence supports any contrary implication. West testified at one point that he inferred that Shotwell was biased against him because Shotwell was the only one in the room when he said that West's age was unacceptable. This inference would have been reasonable if Shotwell had simply stated, without more, that West was too old, but as West acknowledged in his contemporaneous diary, in his EEOC charge, in his deposition, and at trial, Shotwell said that he was conveying the Royal Commission's opinion. While it is possible that Shotwell was not being candid and that he himself believed West was too old, the words Shotwell used when he fired West did not support that inference.

Nor did an inference that Shotwell was biased arise from his failure to protest the Royal Commission's decision. West may understandably have regarded that failure as deplorable disloyalty, but the issue was not whether Shotwell was a loyal or admirable employer, the question was whether Shotwell was personally biased against West. (*Guz v. Bechtel National, Inc.,* *supra,* 24 Cal.4th at p. 358 [in a discrimination case, "the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*"].) It is possible, of course, that Shotwell might not have objected to West's dismissal because he shared the Royal Commission's opinion of West's age, even though he had been apprised of West's age when he hired West the previous month. On the other hand, it is at least as plausible that Shotwell declined to contest West's dismissal because he shared West's apparent

belief at the time that any protest would be futile, or because he did not want to risk offending the Royal Commission, reasons having nothing to do with any personal discriminatory animus. (*Ibid.* [in the context of a discrimination case, reasons for an employment decision are " 'legitimate' " if they are unrelated to a prohibited bias].) Since any inference of bias would be entirely speculative under the circumstances, Shotwell's failure to "go to bat" for West was not substantial evidence of discrimination. (See, e.g., *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651 [51 Cal.Rptr.2d 907]; *Adams v. Workmen's Comp. Appeals Bd.* (1971) 22 Cal.App.3d 214, 217 [99 Cal.Rptr. 269].)

According to West's diary, Shotwell "claimed that there was no recourse," but West suggests, in light of Royal Commission engineer Al-Saeed's offer to intercede on his behalf, that the Royal Commission might have been persuaded to withdraw its order that he be fired. West also ventures that the Royal Commission "was highly unlikely to limit Bechtel's role in this huge construction project merely because it offered a moderate defense of its own employee." However, even if West were correct on both points it would still be speculative to find that Shotwell was biased against him. If Shotwell could have changed the Royal Commission's mind without prejudicing his company's interests, then his failure to object to West's dismissal might simply have been a bad business decision that caused him to lose an employee he *valued*. (See *Guz v. Bechtel National, Inc., supra*, 24 Cal.4th at p. 358 [the "issue is discriminatory animus, not whether the employer's decision was 'wrong or mistaken' "].)

Since there was neither "direct" nor "inferential" proof that bias on Shotwell's part was a motivating factor in his decision to terminate West's employment, the judgment on the discrimination charge must be reversed for lack of substantial evidence. West's arguments against this conclusion lack merit.

West contends that while he was entitled to elicit testimony about Shotwell's statements as those of a party opponent (Evid. Code, § 1220), those statements were inadmissible hearsay insofar as Bechtel sought to inquire into the subject. West reasons that after he testified that Shotwell said his age was unacceptable, Bechtel could not rebut any inference of discriminatory intent arising from that statement without calling Shotwell as a witness. He further submits that the jury could choose to disbelieve Bechtel's evidence concerning Shotwell's motivations because of its failure to produce Shotwell. (BAJI No. 2.02 [failure to produce available stronger evidence].)

These evidentiary arguments are unavailing. ■ The hearsay rule did not prevent admission of West's own statements in his diary and EEOC

charge about what Shotwell told him (Evid. Code, § 1220), nor did it preclude any of the cross-examination of West concerning Shotwell's statements. Statements by Shotwell to the effect that West was too old for the job were not hearsay; they were not offered for the truth of the matter stated (Evid. Code, § 1200, subd. (a)) because West's competence was not in question. Statements attributed by Shotwell to the Royal Commission were likewise not hearsay, because they were either a command (discharge West), or an opinion (because he was too old), or both. Shotwell's stated reasons for terminating West were hearsay because Shotwell's motives were at issue, but such statements were admissible to prove Shotwell's state of mind. (Evid. Code, § 1250, subd. (a).) As for Bechtel's failure to call Shotwell as a witness, given West's burden of proof and failure to sustain that burden, it is immaterial whether the jury could have distrusted some of the defense evidence or that a stronger defense case might have been presented.

The latter observation also applies to West's arguments that Bechtel Corporation failed to prove affirmative defenses of business necessity or bona fide occupational qualification (BFOQ). West perhaps understandably prefers to dwell on showings potentially required of Bechtel, rather than on his own initial burden of proof. However, since West did not present substantial evidence of discriminatory intent on Shotwell's part, Bechtel was not required to establish an affirmative defense.

■ The business necessity defense applies in disparate *impact* cases, where the claim is that an employer's facially neutral employment practice has an unfavorable impact on a protected class. (1 Wrongful Employment Termination Practice (Cont.Ed.Bar 2d ed. 2001) § 2.10, p. 20; 2 Wilcox, Cal. Employment Law (2001) § 41.20, pp. 41-44; see BAJI No. 12.23 [setting forth elements of defense]; Cal. Code Regs., tit. 2, § 7286.7, subd. (b) [same]).) West reasons that Bechtel Corporation cannot make out a business necessity defense in this case without showing that when the 1976 contract between SABCO and the Royal Commission was negotiated, there was no reasonable alternative to granting the Royal Commission the right to terminate California employees for reasons that would violate the FEHA. However, the business necessity defense does not apply in this disparate *treatment* case, where West's discharge, not a general employment practice, is at issue. (Use Note to BAJI No. 12.23 (2001 rev.) (8th ed. 1998) p. 47; Lucas et al., Cal. Civil Practice: Employment Litigation (1993) § 2:79, p. 100.) The business necessity defense was thus irrelevant here, irrespective of the weakness of West's case.

■ The BFOQ defense likewise does not apply. Under that affirmative defense, "[w]here an employer . . . has a practice which on its face excludes

an entire group of individuals on a [prohibited] basis . . . the employer . . . must prove that the practice is justified because all or substantially all of the excluded individuals are unable to safely and efficiently perform the job in question and because the essence of the business operation would otherwise be undermined." (Cal. Code Regs., tit. 2, § 7286.7, subd. (a); see also Gov. Code, § 12941, subd. (a) [age discrimination prohibition "shall not be construed to make unlawful the rejection or termination of employment where the individual applicant or employee failed to meet bona fide requirements for the job or position sought or held"].) West compares Bechtel's position in this case to that of the employer in *Abrams v. Baylor College of Medicine* (5th Cir. 1986) 805 F.2d 528, a medical school that excluded Jewish physicians from a program that supplied doctors to a hospital in Saudi Arabia, for the asserted reason that they would be unable to obtain visas for entry to that country. The court held that the medical school had not established a BFOQ defense because it had simply assumed that Jewish physicians would be excluded from Saudi Arabia without asking the Saudi government about its policy on the matter. (*Id.* at p. 533.) Here, the Saudi governmental entity had expressed its opinion of West. Therefore, even if Bechtel had been called upon to prove an affirmative defense the *Abrams* case would be inapposite.

## B.  *Breach of Contract*

Bechtel advances various arguments against the verdict on the breach of contract claim: (1) that the contract was for an indefinite term, rather than a two-year period; (2) that the statements by Shotwell and Bechtel Infrastructure employee Almuti about the duration of West's Saudi Arabian assignment were not attributable to Bechtel; (3) that the Royal Commission's order that West be terminated precluded any finding that Bechtel breached West's employment contract; and (4) that West failed to mitigate his damages. Since the failure to mitigate is dispositive, we do not reach the other arguments.

■ An employee damaged by the breach of an employment contract "has a duty to take steps to minimize the loss by making a reasonable effort to find comparable employment." (BAJI No. 10.16.) " ' "The familiar rule requiring a plaintiff in a tort or contract action to mitigate damages embodies notions of fairness and socially responsible behavior which are fundamental to our jurisprudence. . . . This general principle governs the obligations of an employee after his employer has wrongfully repudiated or terminated the employment contract. Rather than permitting the employee simply to remain idle during the balance of the contract period, the law requires him to make a reasonable effort to secure other employment." ' " (*Stanchfield v. Hamer Toyota, Inc.* (1995) 37 Cal.App.4th 1495, 1502 [44 Cal.Rptr.2d 565].) Thus,

the employee's recovery is reduced by "the amount which the employer affirmatively proves the employee . . . with reasonable effort might have earned from other employment. . . . [T]he employer must show that the other employment was comparable, or substantially similar, to that of which the employee has been deprived." (*Parker v. Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 181-182 [89 Cal.Rptr. 737, 474 P.2d 689, 44 A.L.R.3d 615].)

■ The evidence showed that Bechtel gave West every opportunity to resume working after he returned from Saudi Arabia. From the moment he arrived in San Francisco to the time he retired, West was offered projects, foreign and domestic, large and small, which suited his abilities and met his salary expectations. West disputed whether he could handle one aspect of one project he was offered—the altitude of the site of the Antamina Project—but he did not demonstrate, even with respect to that project, that he was disabled from accepting the position. West acknowledged that, if he wanted, he could have been working for Bechtel when the case was tried, and indeed that he was "flattered" by all of the offers Bechtel extended. Given West's admitted gratification at the offers he received, he cannot dispute that he was afforded the opportunity for "comparable, or substantially similar" employment (*Parker v. Twentieth Century-Fox Film Corp.*, *supra*, 3 Cal.3d at p. 182) following the alleged breach of the Jubail Project contract.

The only issue is whether West made reasonable efforts to obtain employment after the breach. (1 Wrongful Employment Termination Practice, *supra*, § 8.41, p. 424 [employer must show that equivalent positions were available and that the plaintiff failed to exercise reasonable diligence in seeking them].) Whether the plaintiff has acted reasonably in mitigating damages is ordinarily a question of fact (*Sackett v. Spindler* (1967) 248 Cal.App.2d 220, 239 [56 Cal.Rptr. 435]), but issues of fact become those of law where, as here, the facts are undisputed and permit of only one conclusion (*Kane v. Hartford Accident & Indemnity Co.* (1979) 98 Cal.App.3d 350, 359 [159 Cal.Rptr. 446]; *Shoban v. Board of Trustees* (1969) 276 Cal.App.2d 534, 546 [81 Cal.Rptr. 112]). Since it is indisputable that West was offered comparable, or substantially similar, employment, and he admittedly made no effort whatsoever to pursue such employment, it must be concluded that he failed to mitigate his damages as a matter of law; any other result would ignore the obligation to mitigate. (See *Stanchfield v. Hamer Toyota, Inc.*, *supra*, 37 Cal.App.4th at p. 1502 [employee has duty to retain comparable employment].)

We assume that the result would be different where the evidence showed that the plaintiff suffered from a disability (cf. *Mayer v. Multistate Legal*

*Studies, Inc.* (1997) 52 Cal.App.4th 1428, 1436 [61 Cal.Rptr.2d 336] [receipt of disability benefits does not preclude recovery of damages for benefit period]), but there is no evidence of a disability in this case. After returning from Saudi Arabia, West applied for and received unemployment benefits on the basis that he was able to work (see Unemp. Ins. Code, § 1253, subd. (c)), and he accepted holding status with Bechtel where he continued to receive benefits with the understanding that he was available for assignment. West said that he was discouraged after his experience in Saudi Arabia and fearful of further discrimination by Bechtel, but anyone suffering breach of an employment contract could be expected to have such feelings to some degree. If those excuses were sufficient to spare an employee from making *any* effort to resume work, the duty to mitigate damages would be wholly illusory.

## III. CONCLUSION

The judgment is reversed with directions to enter judgment for Bechtel Corporation. Costs on appeal to Bechtel Corporation.

Sepulveda, J., and Rivera, J., concurred.

A petition for a rehearing was denied April 5, 2002, and the opinion was modified to read as printed above.