76 Cal.Rptr.3d 54 (2008)
161 Cal.App.4th 1547
Marietta HARVEY, Plaintiff and Appellant,
v.
SYBASE, INC., Defendant and Appellant.
Nos. A109300, A111450.
Court of Appeal of California, First District, Division Five.
April 18, 2008.
*58 Reed Smith LLP, Paul D. Fogel and Raymond A. Cardozo, San Francisco; Wilson Sonsini Goodrich & Rosati, Fred W. Alvarez and Troy A. Valdez, Palo Alto, for Defendant and Appellant.
Adams Nye Sinunu Bruni Becht, Bruce Nye, David J. Becht, Barbara R. Adams, San Francisco, and John Lee; Rosen, Bein & Asaro and Andrea G. Asaro, San Francisco, for Plaintiff and Appellant.
Certified for Partial Publication.[*]
SIMONS, J.
In this employment discrimination case, the same person who terminated plaintiff had previously hired and promoted her. Defendant, the employer, relies on several California and federal cases to argue that this "same actor" evidence compels a reversal of the trial court's denial of defendant's motion for judgment notwithstanding the verdict (JNOV) on the issue of liability. We conclude such evidence is entitled to no special weight and does not modify the standard of review, which requires us to affirm if substantial evidence supports the jury's verdict.
Between 1995 and 2003, Nita White-Ivy supervised plaintiff Marietta Harvey in the human resources departments of two separate companies. White-Ivy hired and promoted Harvey at Pyramid Technology and at defendant Sybase, Inc. (Sybase). Following her termination from Sybase by White-Ivy in 2003, Harvey filed an action under the California Fair Employment and Housing Act (FEHA) (Gov.Code, § 12900 et seq.) claiming that Sybase, acting through White-Ivy, violated the FEHA by terminating Harvey based on either her race or her gender. The jury agreed, returned a verdict in Harvey's favor on that claim, and awarded both compensatory and punitive damages. Sybase unsuccessfully moved for JNOV, and, on appeal, challenges that ruling, arguing that the evidence of discriminatory intent Harvey presented was insufficient in light of White-Ivy's long history of treating Harvey *59 with extraordinary favor. Sybase also claims that the trial court committed prejudicial error in responding to a question posed by the jury during deliberations.
Harvey has filed a cross-appeal, contending the trial court erred in granting Sybase JNOV on, the issue of punitive damages and nonsuit on Harvey's claims of wrongful termination in violation of the public policies expressed in Labor Code sections 232 and 232.5. Harvey also contends that the trial court applied the wrong standards when it awarded her attorney fees as a prevailing party under the FEHA.
In the published portion of this opinion, we examine two of the issues raised by the parties in their respective appeals. First, we reject Sybase's contention that same actor evidence should be accorded special weight in reviewing a trial court's decision to deny an employer's motion for JNOV. Second, we analyze the use of Labor Code sections 232 and 232.5 as the bases for claims of wrongful termination in violation of public policy. We determine that the trial court correctly granted nonsuit as to each of these claims because Harvey failed to engage in the activity protected by Labor Code section 232 and because the policy set forth in Labor Code section 232.5 was not "well established" at the time of her discharge.
We address the other issues raised by the parties' appeals in the unpublished portion of our decision. We reverse the trial court's grant of JNOV on the jury's award of punitive damages to Harvey, and we reverse, in part, the court's award of attorney fees. In all other respects, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND[1]
In 1995, eight years prior to Harvey's February 2003 termination from Sybase, she was hired as a human resources (HR) representative at Pyramid Technology by White-Ivy, who was then head of Pyramid's HR department. Both Harvey and White-Ivy are Filipina. White-Ivy promoted Harvey to HR manager a year later. John Chen, who was then Pyramid's president and chief executive officer (CEO), subsequently awarded Harvey a stock bonus.
Chen left Pyramid in 1997 and became president and chief operating officer at Sybase. Soon thereafter, White-Ivy followed Chen to Sybase, where she became a vice-president in charge of worldwide HR. In the spring of 1998, White-Ivy hired Harvey as an HR director at a salary of $100,000 per year. White-Ivy repeatedly promoted Harvey, first to senior HR director, then to group HR director in 2001. The latter position was one that White-Ivy created specifically for Harvey and which made her the second-highest ranking manager in Sybase's HR department. In addition to the promotions, White-Ivy granted Harvey frequent, significant increases in salary and awarded her a number of bonuses and perks. And from the time of her hiring in 1998 until the fall of 2002, White-Ivy gave Harvey very high ratings for her job performance.
In early 2001, Sybase senior manager Steven Capelli remarked to Chen that he thought Sybase's HR department looked like "an airport." Chen interpreted Capelli's comment to mean that the HR department *60 had "diversity problems."[2] Chen then passed the comment on to White-Ivy in early 2001. Following this, White-Ivy made a series of comments reflecting a preference for employing white males.
For example, in the spring of 2001, White-Ivy told HR employee Katie Flotten there were too many Asians in the HR department, there should be more white males, and the department was starting to look like an airport. Senior HR representative Linda Hartman recalled that at a recruiter meeting in approximately February 2002, White-Ivy expressed a preference for hiring white males. HR employee Kristin Straka was present at the meeting and recalled that White-Ivy had expressed a preference for hiring males (but not necessarily white males) and had said "we need more men in this department, because there is too much gossip." Straka also recalled that during a department meeting held sometime after January 2002, White-Ivy said that Chen had commented that the HR department looked like an airport. Flotten recalled that at "various meetings" White-Ivy commented that "we have too many women, because all these people are pregnant and going out on leave." Although Flotten could not remember precisely when White-Ivy made these comments, she testified that the last time she heard them was sometime after January 2002.
In 2002, White-Ivy disclosed certain performance concerns to Harvey. In late September 2002, White-Ivy informed Harvey that she was taking back Harvey's responsibility for corporate staffing, "[d]ue to the criticality of the staffing function and the fact that this is a corporate function." In mid-December, White-Ivy told Harvey that she was considering demoting Harvey from group HR director to senior director. White-Ivy stated she was troubled about a decline in Harvey's performance and she believed that Harvey's performance might improve if her responsibilities were reduced.[3]
In mid-December 2002, directly after White-Ivy told Harvey about the possible demotion, Harvey spoke to Sybase's chief financial officer (CFO), Pieter Van der Vorst, and told him White-Ivy was planning to demote her and cut her pay, but she did not understand why. Harvey did not ask Van der Vorst to speak with Chen about the matter, but Van der Vorst volunteered to do so. After her conversation with Van der Vorst, Harvey had a similar conversation with Sybase senior vice-president Raj Nathan. Harvey testified White-Ivy had not told her how much her pay would be cut and that she was "just waiting for the [personnel action request]."
That same month, Sybase executive vice-president Michael Bealmear spoke to Harvey at an office holiday party and told her he had heard she would no longer be supporting his group. Bealmear later asked White-Ivy why Harvey was in the "penalty box," a term Bealmear had coined, not a term Harvey had used. White-Ivy told Bealmear she was disappointed with Harvey's performance and was trying to reduce Harvey's workload to help her.
In January 2003, White-Ivy told Harvey she would not be demoting her or reducing her pay. Harvey told both Van der Vorst *61 and Nathan that she would not be demoted.
That same month, White-Ivy orally approved two new positions in the HR department, a senior generalist HR director and a senior director of staffing. Requisitions opening the positions were completed on February 5.[4] During a discussion between HR employee Marilyn Seuss-Myers and White-Ivy about the staffing director position, White-Ivy told Seuss-Myers she would not give Seuss-Myers the position because she had concerns about Seuss-Myers' performance. White-Ivy said further that Chen wanted her to hire two white males because he felt that the HR department looked like an airport. White-Ivy told Seuss-Myers that she was helped by the fact that she (Seuss-Myers) was white, but was disadvantaged by the fact that she was not male.
On February 13, 2003, Flotten met with Van der Vorst and told him that she was concerned that she might be terminated because she had gone out on stress leave and had filed a workers' compensation claim. She also mentioned that she felt that the data in an HR department survey had been tampered with. On the same day, Kristin Straka spoke to Van der Vorst about the HR department survey and explained that she had been told that some of the results were changed to make them appear more favorable to the HR department.
After hearing from Harvey, Flotten, and Straka, Van der Vorst met with Chen and told him about the conversations. Chen gave Van der Vorst permission to discuss the matter with White-Ivy. On February 13 or 14, 2003, Van der Vorst met with White-Ivy and discussed with her some of the concerns that Harvey, Flotten, and Straka had voiced to him. After Van der Vorst met with White-Ivy alone, he met with her again in Chen's presence to discuss the concerns of these three HR employees.
On February 18, 2003, White-Ivy went to Harvey's office and accused Harvey of having spoken to Van der Vorst the previous Friday and to Bealmear about being put in the "penalty box." Harvey denied having spoken to Van der Vorst the previous Friday and said she had not told Bealmear that White-Ivy had put her in the "penalty box," adding that "[t]hose are not my words." White-Ivy instructed Harvey to come to her office at 2:00 p.m.
When Harvey arrived for the 2:00 p.m. meeting, White-Ivy said that the purpose of the meeting was to terminate Harvey's employment at Sybase. White-Ivy said Harvey had "stabbed [White-Ivy] in the back" by telling Bealmear that White-Ivy had put her in the "penalty box." Harvey denied using the phrase "penalty box" in speaking to Bealmear. At the end of the meeting, White-Ivy told Harvey she was eliminating Harvey's group director position. In Sybase's HR documentation, White-Ivy characterized the termination as an "elimination of position" rather than as one for cause. White-Ivy offered Harvey two and one-half month's severance pay provided Harvey signed a release of claims against Sybase. Harvey did not sign the release and received no severance package.
White-Ivy later stated she terminated Harvey because Harvey had betrayed her trust by making derogatory comments about White-Ivy, by lying about speaking to Van der Vorst, and by telling Van der Vorst (untruthfully, in White-Ivy's view) *62 that she did not understand why White-Ivy proposed demoting her. The decisive factor, according to White-Ivy, was Harvey's conversation with Van der Vorst; that "completed [her] decision" to terminate Harvey.
The next day, February 19, 2003, White-Ivy held a meeting for the entire HR department. During the meeting, White-Ivy discussed a restructuring of responsibilities within the HR department, and explained that there would be two new senior HR directors. About one week later, Harvey called Chen to express her interest in being considered for one of the positions. Chen told Harvey he "would love for [Harvey] to come back to Sybase" but she should talk to White-Ivy to work out their differences.
Harvey and White-Ivy then arranged an interview for Harvey on the evening of April 2, 2003. On that day, however, Harvey received a letter from White-Ivy stating she had chosen other candidates for the positions sought by Harvey. The two positions were ultimately filled by two white males.
On July 22, 2003, after receiving a right to sue letter from the FEHA, Harvey filed an action against Sybase in Alameda County Superior Court. Her complaint alleged Sybase had violated Government Code section 12940[5] by terminating and not rehiring her due to her gender, race, or national origin. She also claimed wrongful termination in violation of the public policies expressed in Labor Code sections 232.5 and 923.[6] The trial court later granted Harvey leave to amend her complaint to add a claim for wrongful termination in violation of the public policy expressed in Labor Code section 232. Sybase defended the action, claiming that discrimination had played no part in the company's decision to terminate Harvey, and White-Ivy had fired Harvey for lying and insubordination.
Trial in this action began in September 2004. After the close of plaintiffs case, the trial court granted Sybase's motion for nonsuit on Harvey's claims for wrongful termination in violation of public policy, but denied Sybase's motion for nonsuit on Harvey's discrimination claims.
The jury returned a verdict for Harvey. It found that Harvey's race or gender was a motivating reason for her termination and further found that White-Ivy would not have terminated Harvey without regard to her race or gender. The jury also found that Harvey's race or gender was a motivating reason in the decision not to rehire her, but found that White-Ivy would not have rehired her in any event. Based on these findings, the jury awarded Harvey a total of $1,342,943 in compensatory damages. After a bifurcated punitive damages phase, the jury awarded Harvey $500,000 in punitive damages.
Sybase then moved for a new trial and for JNOV. It challenged the sufficiency of the evidence to support both liability and punitive damages, and argued that the trial *63 court had prejudicially erred in responding to a question the jury had posed during the course of its deliberations.[7] In an order filed December 6, 2004, the trial court granted JNOV on the punitive damages verdict and a conditional new trial on that component in the event its JNOV ruling was set aside on appeal; it denied the motions in all other respects. The trial court found as a matter of law that White-Ivy's conduct did not amount to malice or oppression. It concluded that although White-Ivy obviously intended to fire Harvey, this was not the sort of "intent to cause injury" required to support an award of punitive damages.
The trial court then entered judgment for Harvey in the amount of $1,342,943, plus costs to be determined by the court. The trial court subsequently entered an order awarding Harvey $28,602.98 in costs.
Sybase filed an appeal from the judgment and the portion of the trial court's order denying its motion for JNOV or, in the alternative, for new trial. Harvey cross-appealed from the judgment and from the portion of the trial court's order granting JNOV to Sybase on the issue of punitive damages.
After briefing and argument, the trial court awarded Harvey approximately $620,000 in attorney fees for the fees incurred in prosecuting her case. In a separate order, the trial court granted Harvey $75,000 for "fees-on-fees," or the fees incurred in pursuing her attorney fee claims against Sybase. Harvey appealed from both fee orders, and Sybase filed cross-appeals. We then consolidated the appeals for briefing and disposition.
DISCUSSION

I. SYBASE'S APPEAL
Sybase first challenges the trial court's denial of its motion for JNOV. It argues there was no substantial evidence from which the jury could find that Harvey was terminated for discriminatory reasons. It also contends the trial court erred in its response to a question the jury posed during deliberations concerning Sybase's "mixed-motive" affirmative defense.

A. The Sufficiency of the Evidence

1. Standard of Review-The Substantial Evidence Test

Sybase challenges the superior court's denial of its motion for JNOV. An appeal from a denial of such a motion is a challenge to the sufficiency of the evidence supporting the jury's verdict and the trial court's decision. (Carter v. CB Richard Ellis, Inc. (2004) 122 Cal.App.4th 1313, 1320, 19 Cal.Rptr.3d 519.) "In ruling on a motion for JNOV, `"the trial court may not weigh the evidence or judge the credibility of the witnesses, ... but must accept the evidence tending to support the verdict as true, unless on its face it should be inherently incredible. Such order may be granted only when, disregarding conflicting evidence and indulging in every legitimate inference which may be drawn from plaintiffs evidence, the result is no evidence sufficiently substantial to support the verdict."' [Citation.]" (Ibid.)
In reviewing the trial court's denial of a motion for JNOV, our task is to determine whether there is any "substantial evidence," whether contradicted or uncontradicted, supporting the jury's conclusion; if such substantial evidence exists, *64 we must uphold the trial court's denial of the motion. (Shapiro v. Prudential Property & Casualty Co. (1997) 52 Cal.App.4th 722, 730, 60 Cal.Rptr.2d 698.) "`Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citations.] `Substantial evidence ... is not synonymous with "any" evidence.' Instead, it is `"`substantial' proof of the essentials which the law requires."' [Citations.]" (Roddenberry v. Roddenberry (1996) 44 Cal.App.4th 634, 651, 51 Cal. Rptr.2d 907.) The ultimate question before us is "whether a reasonable trier of fact could have found for the respondent based on the whole record." (Kuhn v. Department of General Services (1994) 22 Cal.App.4th 1627, 1633, 29 Cal.Rptr.2d 191; accord, Reeves v. Sanderson Plumbing Products, Inc. (2000) 530 U.S. 133,150, 120 S.Ct. 2097, 147 L.Ed.2d 105.)[8]

2. Proving Discriminatory Intent-Legal Framework

The FEHA prohibits discrimination in employment on the basis of certain enumerated personal characteristics, including race, national origin, and gender. (Gov.Code, § 12940, subd. (a).) In an action under the FEHA, a plaintiff must show that she suffered an adverse employment action because of a protected characteristic. (Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2007) ¶ 7:345, p. 7-57) One way a plaintiff may do this is by proving "disparate treatment," which is "intentional discrimination against one or more persons on prohibited grounds." (Guz v. Bechtel National, Lie, supra, 24 Cal.4th at p. 354, fn. 20, 100 Cal.Rptr.2d 352, 8 P.3d 1089; Frank v. County of Los Angeles (2007) 149 Cal. App.4th 805, 822, 57 Cal.Rptr.3d 430.)
"In some cases, the evidence will establish that the employer had `mixed motives' for its employment decision. [Citation.]" (Heard v. Lockheed Missiles & Space Co. (1996) 44 Cal.App.4th 1735, 1748, 52 Cal.Rptr.2d 620.) In such a case, "both legitimate and illegitimate factors contribute to the employment decision." (Ibid.) In a mixed-motive case, the plaintiffs initial burden is to prove that discrimination was a motivating factor in the adverse employment action, even though other factors may also have been involved. (Chin et al., Cal. Practice Guide: Employment Litigation, supra, ¶ 7:488, p. 7-82.) If the plaintiff meets this burden, then the burden shifts to the employer to demonstrate that it would have taken the same action even if it had not taken the prohibited characteristic into account. (Id., ¶ 7:490, p. 7-83.)
Once the case is submitted to the jury, "the jury is left to decide which evidence it finds more convincing, that of the employer's discriminatory intent, or that of the employer's [nondiscriminatory] reasons for the employment decision." (Caldwell v. Paramount Unified School Dist. (1995) 41 Cal.App.4th 189, 204, 48 Cal.Rptr.2d 448.) As a consequence, in reviewing the denial of Sybase's motion for JNOV, we consider only "whether the trial court correctly concluded that ... substantial evidence supported the jury's conclusion." (See Begnal v. Canfield & Associates, Inc. (2000) 78 Cal.App.4th 66, 73, 92 Cal. Rptr.2d 611.)

3. Same Actor Evidence

In support of the verdict, Harvey points to a number of statements demonstrating *65 a discriminatory animus. In particular, she relies on the "airport" remark made by Capelli to Chen in 2001, and relayed by Chen to White-Ivy. Chen testified that he understood Capelli's remark to mean that the HR department had "diversity problems" because in his "experience the airport, at the time, was very dominated by Asians." Harvey also argues that certain comments by White-Ivy, testified to by HR employees Flotten, Straka, Hartman and Seuss-Myers, provided substantial evidence that White-Ivy understood Chen's remark to her as a directive to increase the proportion of white males in the HR department, and Harvey's discharge was designed to help accomplish this goal. We agree. Though the "pivotal issue in disparate treatment cases [is] whether a particular individual was discriminated against and why" (Heard v. Lockheed Missiles & Space Co., supra, 44 Cal.App.4th at p. 1756, 52 Cal. Rptr.2d 620), remarks by the decision maker reflecting a general intent to discriminate against members of the same protected group as the plaintiff provide substantial evidence of a discriminatory animus toward the plaintiff. (Cordova v. State Farm Ins. Co. (9th Cir.1997) 124 F.3d 1145, 1149; see Chuang v. Univ. of California Davis (9th Cir.2000) 225 F.3d 1115, 1128; Godwin v. Hunt Wesson, Inc. (9th Cir.1998) 150 F.3d 1217, 1221.)
Relying on both federal and California case law, Sybase argues, however, that the jury's verdict was not supported by substantial evidence because the "same actor rule" raised a strong inference that White-Ivy did not discriminate in terminating Harvey, and Harvey failed to offer substantial evidence to overcome that inference. "`[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive.'" (Horn v. Cushman & Wakefield Western, Inc. (1999) 72 Cal.App.4th 798, 809, 85 Cal.Rptr.2d 459, quoting Bradley v. Harcourt, Brace and Co. (9th Cir.1996) 104 F.3d 267, 270-271; accord, West v. Bechtel Corp. (2002) 96 Cal.App.4th 966, 980, 117 Cal.Rptr.2d 647; Slatkin v. University of Redlands (2001) 88 Cal.App.4th 1147, 1158, 106 Cal.Rptr.2d 480.)
The rationale underlying this inference is that "`[f]rom the standpoint of the putative discriminator, "[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job."'" (Horn v. Cushman & Wakefield Western, Inc., supra, 72 Cal.App.4th at p. 809, 85 Cal. Rptr.2d 459, quoting Proud v. Stone (4th Cir.1991) 945 F.2d 796, 797.) The same actor inference has also been applied in cases in which the putative discriminator promoted the plaintiff before taking adverse action against him. (See Coghlan v. American Seafoods Co. LLC. (9th Cir. 2005) 413 F.3d 1090, 1098.)
Judicial analysis of the effect of same actor evidence has been clouded by imprecise language. California cases, for example, have stated that same actor evidence creates both an "inference" and a "presumption," sometimes within the same sentence. (See Horn v. Cushman & Wakefield Western, Inc., supra, 72 Cal.App.4th at p. 809, fn. 7, 85 Cal.Rptr.2d 459; see also West v. Bechtel Corp., supra, 96 Cal. App.4th at p. 981, 117 Cal.Rptr.2d 647.) The Ninth Circuit has explained that "[t]he same actor inference is neither a mandatory presumption (on the one hand) nor a mere possible conclusion for the jury to draw (on the other). Rather it is a `strong inference' that a court must take into account on a summary judgment motion. *66 [Citation.]"[9] (Coghlan v. American Seafoods Co. LLC, supra, 413 F.3d at p. 1098.) "[W]hen the allegedly discriminatory actor is someone who has previously selected the plaintiff for favorable treatment, that is very strong evidence that the actor holds no discriminatory animus, and the plaintiff must, present correspondingly stronger evidence of bias in order to prevail." (Id. at p. 1096, fn. 10; see also Bradley v. Harcourt, Brace and Co., supra, 104 F.3d at p. 271 ["strong inference"].) Horn also adopted the "strong inference" language. (Horn, at p. 809, 85 Cal.Rptr.2d 459.)
Sybase's reference to a "same actor rule" is not rooted in any cited case. And presumptions and inferences, though similar, are distinct. Our Evidence Code defines a presumption as "an assumption of fact that the law requires to be made from another fact or group of facts ... established in the action" (Evid.Code, § 600, subd. (a), italics added), and presumptions may be created by case law as well as by statute (2 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 2008) Presumptions, § 46.30, p. 1094). But, despite the apparent assumptions in Horn and West, no California case or statute has created a same actor presumption. An inference, on the other hand, is driven by logic, not law. It "is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts ... established by the evidence." (Evid. Code, § 600, subd. (b).) Clearly, same actor evidence will often generate an inference of nondiscrimination. But whether or not the inference so drawn is a strong inference should not be an a priori determination, divorced from its factual context. Among the factors that influence the strength of such an inference are: (1) the nature of the benefit(s) conferred and the adverse employment action taken by the actor; (2) the length of time between the positive and negative actions taken; and (3) the existence and nature of any motivating factors for the adverse action that arose after the benefit was conferred. The facts of our case well illustrate the mistake in positing that same actor evidence always creates a strong inference.
The existence of same actor evidence in an employment discrimination case should not change the standard for reviewing the denial of a motion for JNOV or alter the meaning of the term "substantial evidence" contained in that standard. The West case, relied upon by Sybase in its same actor argument, in fact supports our conclusion. The procedural posture of West was identical to our own. Plaintiff had prevailed on his age discrimination claim in the trial court, and Bechtel's motion for JNOV had been denied. On appeal, Bechtel claimed the trial court erred in denying its motion. Following a two-step analysis, West agreed. First the *67 same individual who fired West had hired him one month before, creating an inference of nondiscrimination. (West v. Bechtel Corp., supra, 96 Cal.App.4th at pp. 980-981, 117 Cal.Rptr.2d 647.) Second, "[n]o substantial evidence supported] any contrary implication." (Id. at p. 981, 117 Cal. Rptr.2d 647.) West, in other words, recognized that in the appeal of a denial of a motion for JNOV, the same actor inference does not change the standard of review: if substantial evidence to support the plaintiffs verdict exists, we must affirm.
In its briefing, Sybase pays lip service to this principle. But Sybase consistently argues that the introduction of same actor evidence places a higher burden on a plaintiff in an employment discrimination case. Principally, Sybase contends that its same actor evidence requires Harvey to introduce specific evidence of White-Ivy's animus toward Harvey. Sybase argues that evidence of an intent to discriminate against members of Harvey's race and gender is insufficient.
We disagree. We would usurp the jury's function if we adopted the Sybase approach. Our case contains strong same actor evidence, but there is also substantial evidence that White-Ivy had formed the intent to make race- and gender-based personnel decisions in the HR department. It is not our job to determine, as a matter of law, the strength of the competing inferences. Instead, the jury must do so, and, on review we are limited to deciding if substantial evidence supports that determination. Evidence that the same actor conferred an employment benefit on an employee before discharging that employee is simply evidence and should be treated like any other piece of proof. (Waldron v. SL Industries, Inc. (3d Cir.1995) 56 F.3d 491, 496, fn. 6; see Williams v. Vitro Services Corp. (11th Cir. 1998) 144 F.3d 1438, 1443.) Placing it in a special category as a "rule" or "presumption" or stating it creates a "strong inference" attaches undue influence to same actor evidence and threatens to undermine the right to a jury trial by improperly easing the burden on employers in summary judgment and postverdict motions. The trial court correctly rejected the argument that the jury's verdict lacked substantial evidence to support it.

B. Sybase's Claim of Instructional Error[**]

II. HARVEY'S CROSS-APPEAL

A. Substantial Evidence Supported the Jury's Award of Punitive Damages[**]

B. The Trial Court Properly Granted Nonsuit on Harvey's Claims of Wrongful Termination in Violation of Public Policy

In her cross-appeal, Harvey challenges the superior court's grant of nonsuit on her claims of wrongful termination in violation of public policy.[14] Harvey alleged in *68 her complaint that "[t]he decisions to terminate [her] employment and to refuse to rehire [her] were made in retaliation for [her] alleged disclosure and discussion of information about [Sybase's] working conditions with other employees of [Sybase]." She claimed the decisions to terminate and not rehire her violated the public policies set forth in Labor Code sections 232.5[15] and 923. Harvey later amended her complaint to include a claim under Labor Code section 232[16] that she was terminated and not rehired because of her "alleged disclosure and discussion of information about [Sybase's] working conditions and [her] salary with other employees of [Sybase]." On appeal, Harvey no longer relies on section 923 (see fn. 6, ante, p. 62) and confines her argument to her claims based on sections 232 and 232.5.
Although Harvey's claims based on these statutes are closely related factually, we analyze each of the statutory provisions separately to determine whether Sybase was entitled to judgment as a matter of law on these claims. In reviewing a grant of nonsuit, the appellate court views the evidence in the light most favorable to plaintiff to determine whether evidence presented by plaintiff is insufficient to permit the jury to find in her favor. (See Nally v. Grace Community Church (1988) 47 Cal.3d 278, 291, 253 Cal.Rptr. 97, 763 P.2d 948.)

1. Elements of the Claim

In California, employment contracts are generally terminable at will. (Lab.Code, § 2922.) Thus, "[a]n employer may discharge an at-will employee `for no reason, or for an arbitrary or irrational reason.'" (Carter v. Escondido Union High School Dist. (2007) 148 Cal.App.4th 922, 929, 56 Cal.Rptr.3d 262.) "On occasion, employers have abused the at will relationship by discharging employees for reasons contrary to public policy as expressed in statutory or constitutional mandates. In response, courts have created an exception to, or qualification of, the at will employment principle ...: An employer may not discharge an at will employee for a reason that violates fundamental public policy. This exception is enforced through tort law by permitting the discharged employee to assert against the employer a cause of action for wrongful discharge in violation of fundamental public policy." (Stevenson v. Superior Court (1997) 16 Cal.4th 880, 887, 66 Cal.Rptr.2d 888, 941 P.2d 1157 (Stevenson).)
To establish a claim for wrongful termination in violation of public policy, a plaintiff must prove: (1) an employer-employee relationship, (2) termination, (3) a nexus between' the termination and the employee's engagement in protected activity, (4) causation, and (5) damages. (See Chin et al., Cal. Practice Guide: Employment Litigation, supra, ¶ 5:10, p. 5-2, citing Holmes v. General Dynamics Corp. (1993) 17 Cal.App.4th 1418, 1426, 22 Cal. Rptr.2d 172.) California courts have recognized a tort cause of action for wrongful termination in violation of public policy in a number of instances, including where an *69 employee is discharged for "exercising ... a statutory or constitutional right or privilege." (Pettus v. Cole (1996) 49 Cal. App.4th 402, 454, 57 Cal.Rptr.2d 46.) However, where an employee asserts that she has been discharged for exercising a statutory right, she must prove that she actually exercised the right protected by the statute. (See Hejmadi v. AMFAC, Inc. (1988) 202 Cal.App.3d 525, 539, 249 Cal.Rptr. 5 [plaintiff could state no claim for "whistleblowing" under Lab.Code, § 1102.5, which prohibits retaliation against employees who disclose violations of law to government or law enforcement agencies, where plaintiff made no complaints to any governmental agency].)

2. Sybase Was Entitled to Judgment on Harvey's Labor Code Section 232 Claim Because Harvey Did Not Disclose the "Amount of Her Wages"

Labor Code section 232, subdivision (c) prohibits an employer from discharging an employee "who discloses the amount of his or her wages." In Grant-Burton, the Second District held that section 232, in combination with Labor Code section 923 and provisions of the National Labor Relations Act (29 U.S.C. § 151 et seq.), could support a claim of wrongful termination in violation of public policy. (Grant-Burton, supra, 99 Cal.App.4th at p. 1376, 122 Cal. Rptr.2d 204.) We conclude, however, that no substantial evidence supports Harvey's claim under this statute.
Harvey argues her conversations with Van der Vorst concerning White-Ivy's announced intention to demote Harvey and cut her pay provide a factual basis for her claim under Labor Code section 232. Harvey claims that she "disclose[d] the amount of her wages" during these conversations and that Sybase later terminated her in part because of this claimed disclosure. The undisputed evidence, however, establishes that she did not disclose the amount of her wages to Van der Vorst.
Harvey admitted in her trial testimony that, during her meetings with Van der Vorst, she did not tell him how much she made and did not discuss the amount of her wages. This was entirely consistent with Van der Vorst's account of their conversations. He testified Harvey did not discuss her salary with him and they did not speak about the amount of the proposed pay cut. In light of this consistent and undisputed testimony, it is apparent that Harvey did not "disclose[ ] the amount of ... her wages." (Lab.Code, § 232, subd. (c).) The trial court's grant of nonsuit to Sybase on this claim was, therefore, entirely proper.[17] (See Hejmadi v. AMFAC, Inc., supra, 202 Cal.App.3d at p. 539, 249 Cal.Rptr. 5.)
Harvey seeks to avoid this result by relying on Grant-Burton. According to Harvey, the plaintiff in Grant-Burton "did not disclose any amount of her wages whatsoever, but only the fact that her compensation package did not include a bonus." Harvey also points to dictum in *70 Grant-Burton in which the court stated that "[t]he very purpose of [Labor Code section 232] is to protect employees who want to discuss some aspect of their compensation, for example, a possible increase in pay, perceived disparities in pay, or the awarding of bonuses." (Grant-Burton, supra, 99 Cal.App.4th at pp. 1376-1377, 122 Cal.Rptr.2d 204, underscoring by Harvey.) Harvey reasons that "if section 232 protects a discussion about a `possible increase in pay,' it also protects the disclosure of a threatened decrease in pay." As we explain, Grant-Burton will not bear the weight Harvey places upon it.
In Grant-Burton, the plaintiff, a marketing director for a company, had taken part in a meeting with her fellow marketing directors at which the subject of bonuses was discussed. (Grant-Burton, supra, 99 Cal.App.4th at p. 1366, 122 Cal. Rptr.2d 204.) At that meeting, plaintiff revealed to her coworkers that she did not receive a bonus. (Id. at p. 1367, 122 Cal. Rptr.2d 204.) Six days later, the company fired the plaintiff, and company officials later admitted that plaintiffs discussion of bonuses was one of the reasons for her termination. (Id. at pp. 1367-1368, 122 Cal.Rptr.2d 204.) Contrary to Harvey's contention, the court in Grant-Burton expressly recognized that the plaintiff in that case did disclose the amount of her wages. Indeed, in rejecting the employer's claim that the plaintiff had not done so, the court noted, "Grant-Burton did not receive a bonus. The amount of her wages in that respect was zero." (Id. at p. 1378, 122 Cal.Rptr.2d 204, italics added.) Thus, Harvey's interpretation of the case is simply incorrect.
Though Grant-Burton made a passing reference to "a possible increase in pay," cases are not considered legal authority for propositions that are not squarely presented by the facts. (See, e.g., American Federation of Labor v. Unemployment Ins. Appeals Bd. (1996) 13 Cal.4th 1017, 1039, 56 Cal.Rptr.2d 109, 920 P.2d 1314; see also People v. Superior Court (Marks) (1991) 1 Cal.4th 56, 65-66, 2 Cal.Rptr.2d 389, 820 P.2d 613 [language used in any opinion must be understood in light of the facts and the issue then before the court].) Harvey seems to assume that the hypothetical discussion of "a possible increase in pay" alluded to in Grant-Burton would not involve a discussion of the amount of the possible increase. But there is nothing in the language of the case to justify such an assumption, and for good reason. In Grant-Burton there was no evidence of a possible pay increase in an undisclosed amount, and the court had no occasion to consider whether such a discussion would be protected by Labor Code section 232. The case does not support Harvey's argument, and we see no reason in this case to expand Grant-Burton beyond its holding.

3. Sybase Was Entitled to Judgment on Harvey's Claim Under Labor Code Section 232.5 Because There Was No "Well Established" Public Policy Prohibiting Her Termination at the Time of Her Discharge

In the court below, Harvey also advanced a claim for wrongful termination in violation of the public policy expressed in Labor Code section 232.5, which prohibits the discharge of an employee "who discloses information about the employer's working conditions."[18] (§ 232.5, subd. (c).) *71 Although no case has yet held that a wrongful termination claim may be based on section 232.5, we will assume solely for the purposes of our discussion that the statute could support such a claim in appropriate circumstances. (See Grant-Burton, supra, 99 Cal.App.4th at p. 1372, 122 Cal.Rptr.2d 204 [the statutes, that most clearly support a claim for wrongful termination in violation of public policy are those that expressly prohibit termination of employment for specified reasons].) We will also assume, without deciding, that Harvey's conduct satisfied the statute's requirements that Harvey "disclose" information about Sybase's "working conditions."[19] Even so, we conclude that the trial court properly granted nonsuit on Harvey's claim because the policy set forth in section 232.5 was not "well established" at the time of Harvey's discharge.

a. Determining Whether a Statutory Policy Will Support a Claim for Wrongful Termination

The California Supreme Court has "articulated a four-part test for determining whether a particular policy can support a common law wrongful discharge claim. The policy `must be: (1) delineated in either constitutional or statutory provisions; (2) "public" in the sense that it "inures to the benefit of the public" rather than serving merely the interests of the individual; (3) well established at the time of the discharge; and (4) substantial and fundamental.'" (City of Moorpark v. Superior Court (1998) 18 Cal.4th 1143, 1159, 77 Cal. Rptr.2d 445, 959 P.2d 752, quoting Stevenson, supra, 16 Cal.4th at p. 894, 66 Cal. Rptr.2d 888, 941 P.2d 1157.) We focus on the third prong of this test. As a leading treatise explains, the rationale underlying this requirement is that "[e]mployers must have adequate notice of the conduct that will subject them to tort liability." (Chin et al., Cal. Practice Guide: Employment Litigation, supra, ¶ 5:106, p. 5-17.)

b. Labor Code Section 232.5's Policy Was Not "Well Established" When Harvey Was Terminated

Sybase contends that the trial court's nonsuit ruling was correct because at the time of Harvey's discharge, there was no "well established" public policy protecting Harvey's right to complain about her proposed demotion or her supervisor. (Gantt v. Sentry Insurance (1992) 1 Cal.4th 1083, 1090, 4 Cal.Rptr.2d 874, 824 P.2d 680 (Gantt), overruled on another point in Green v. Ralee Engineering Co. (1998) 19 Cal.4th 66, 80, fn. 6, 78 Cal.Rptr.2d 16, 960 P.2d 1046, citing Foley v. Interactive Data Corp. (1988) 47 Cal.3d 654, 669-670, 254 Cal.Rptr. 211, 765 P.2d 373; see also Stevenson, supra, 16 Cal.4th at p. 894, 66 Cal.Rptr.2d 888, 941 P.2d 1157.) As Sybase notes, Labor Code section 232.5 became effective on January 1, 2003 (see Stats.2002, ch. 934, § 2), approximately six weeks before Harvey's termination.
Harvey argues that once a policy is expressed in a statute, it is necessarily "well established" for purposes of a wrongful *72 termination claim. In her view, when the employee's right and the employer's obligation stem directly from a statute, "the concern that they be `well established' or `firmly established' is eliminated-the legislature has well and firmly established the right and obligation." Her argument rests on a statement in Stevenson that the third prong of the test is that "the policy must have been articulated at the time of the discharge." (Stevenson, supra, 16 Cal.4th at p. 890, 66 Cal.Rptr.2d 888, 941 P.2d 1157, italics added.) For several reasons, we disagree with her contention.
First, only four pages after the quoted passage appears, the Supreme Court restated the test, and explained that "for a policy to support a wrongful discharge claim, it must be: ... (3) well established at the time of the discharge." (Stevenson, supra, 16 Cal.4th at p. 894, 66 Cal.Rptr.2d 888, 941 P.2d 1157.) And only two paragraphs before the passage in question, Stevenson had noted the requirement set out in Gantt that the policy be "`well established' at the time of the discharge." (Stevenson, at p. 889, 66 Cal.Rptr.2d 888, 941 P.2d 1157, citing Gantt, supra, 1 Cal.4th at p. 1090, 4 Cal.Rptr.2d 874, 824 P.2d 680.) More important, the Stevenson court later explained that the policy in question in that case-the FEHA's prohibition against age discrimination-had been in effect since 1961, some 19 years before the FEHA's enactment in 1980. (Stevenson, at p. 895, 66 Cal.Rptr.2d 888, 941 P.2d 1157.) This observation would have been unnecessary had the enactment of the FEHA been all that was required to create a "well established" public policy.
Second, if we were to adopt Harvey's argument, we would effectively merge the first and third prongs of the Supreme Court's four-part test. The first prong of the test requires that the policy be "tethered" to either a constitutional or statutory provision. (Gantt, supra, 1 Cal.4th at p. 1095, 4 Cal.Rptr.2d 874, 824 P.2d 680.) If the mere passage of a statute meant that a public policy was well or firmly established such that it could support a tortious discharge claim, then there would be no need for the third prong of the test.
Finally, it is clear that Harvey's interpretation of Stevenson is inconsistent with the reading that both the California Supreme Court and this court have given to it. Since the opinion in Stevenson was issued, our Supreme Court has reiterated that the public policy upon which a tortious discharge claim is based be "well established at the time of the discharge" (City of Moorpark v. Superior Court, supra, 18 Cal.4th at p. 1159, 77 Cal.Rptr.2d 445, 959 P.2d 752), a formulation anticipated by this Division (Sullivan v. Delta Air Lines, Inc. (1997) 58 Cal.App.4th 938, 942, 68 Cal. Rptr.2d 584).
Harvey then argues that the policy was well established prior to the enactment of Labor Code section 232.5. Citing a statement in Hentzel v. Singer Co. (1982) 138 Cal.App.3d 290, 188 Cal.Rptr. 159, Harvey contends that "California has long maintained a policy of protecting the right of employees to voice their dissatisfaction with working conditions." (Id. at p. 296, 188 Cal.Rptr. 159.) But the court in Hentzel was dealing with "hazardous working conditions caused by other employees smoking in the workplace." (Id. at p. 293, 188 Cal.Rptr. 159.) Such environmental workplace hazards are not at issue here. In addition, in support of this policy, Hentzel relied on Labor Code section 923 (Hentzel, at p. 296, 188 Cal.Rptr. 159), and Harvey has abandoned her claims under that section (see fn. 6, ante, p. 62). Hentzel also relied on other provisions of the Labor Code that had established a state policy of guaranteeing safe and healthful workplaces since 1917. (Hentzel, at pp. *73 297-298, 188 Cal.Rptr. 159.) Hentzel is inapposite; it fails to support the contention that Harvey's right to discuss her proposed demotion was firmly established before the enactment of section 232.5.
We need not fully flesh out the precise amount of time that is required before a statutory policy may be considered "well established," in order to conclude that the six-week period in this case is too short. Absent evidence that the policy predated the statute's effective date, a policy so new cannot serve as the basis for the "potent remedy" of a tort action for wrongful termination. (Cf. Gantt, supra, 1 Cal.4th at p. 1090, 4 Cal.Rptr.2d 874, 824 P.2d 680.) Accordingly, we hold that the superior court properly granted nonsuit to Sybase on Harvey's claim for wrongful termination based upon Labor Code section 232.5.

C. Attorney Fees[***]

DISPOSITION
We reverse the superior court's grant of JNOV to Sybase on the issue of punitive damages and direct the superior court to reinstate the jury's punitive damages verdict. We remand the award of attorney fees with directions that the superior court restore to the fee award an appropriate amount for time spent on the punitive damages issue. In all other aspects, the judgment is affirmed. Each party shall bear its own costs on appeal.
We concur: JONES, P.J., and STEVENS, J.[]
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, parts I.B., II.A. and II.C. of this opinion are not certified for publication.
[1] In this appeal, Sybase challenges the denial of its motion for JNOV. In such a case, we state the facts in the light most favorable to Harvey, who was the prevailing party below. (Gibbs v. American Airlines, Inc. (1999) 74 Cal.App.4th 1, 4, fn. 1, 87 Cal.Rptr.2d 554.) Here, we also recite the same actor evidence relied upon by Sybase in order to properly resolve its argument that such evidence impacts our review.
[2] Capelli did not testify at the trial and we have no direct evidence of what message he intended to convey by his airport remark.
[3] The parties presented conflicting evidence at trial concerning the alleged decline in Harvey's performance. This evidentiary dispute has minimal relevance to these appeals because Sybase does not contend that it terminated Harvey for poor performance. (See Lowe v. J.B. Hunt Transport, Inc. (8th Cir. 1992) 963 F.2d 173, 175.)
[4] To approve a new position at Sybase, the HR department completes a "requisition," a written approval of the position. After the requisition has been completed, the job opening is published and recruitment occurs.
[5] Government Code section 12940, subdivision (a), provides in pertinent part: "It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California: [¶] (a) For an employer, because of the race, ..., national origin, . . ., [or] sex, ... of any person, to refuse to hire or employ the person or ... to discharge the person from employment ..., or to discriminate against the person in compensation or in terms, conditions, or privileges of employment."
[6] On appeal, Harvey does not address her claim under Labor Code section 923, and we therefore treat it as abandoned.
[7] During its deliberations, the jury had asked the court to explain the meaning of a portion of the jury instructions. The question concerned what constituted a legitimate reason for discharge and asked whether "retaliation" was a legitimate reason for termination. We set out the facts relevant to this issue in the discussion section of this opinion.
[8] Because of the similarity between federal and state antidiscrimination laws, California courts look to pertinent federal precedent when applying the FEHA. (Guz v. Bechtel National. Inc. (2000) 24 Cal.4th 317, 354, 100 Cal.Rptr.2d 352, 8 P.3d 1089.)
[9] Coghlan applied the same actor inference in the context of a summary judgment motion. (Coghlan v. American Seafoods Co. LLC, supra, 413 F.3d at p. 1098.) Appellate courts have also applied the inference in reviewing postverdict motions. (West v. Bechtel Corp., supra, 96 Cal.App.4th at pp. 980-981, 117 Cal.Rptr.2d 647 [applying same actor inference in reversing denial of employer's motion for JNOV]; see also Grossmann v. Dillard Department Stores, Inc. (8th Cir.1997) 109 F.3d 457, 459 [considering same actor inference in reversing district court's denial of employer's motion for judgment as a matter of law]; Jacques v. Clean-Up Group, Inc. (1st Cir.1996) 96 F.3d 506, 512 [considering same actor inference in reviewing denial of plaintiff's motion for judgment as a matter of law after verdict for employer]; Birkbeck v. Marvel Lighting Corp. (4th Cir.1994) 30 F.3d 507, 513 [applying same actor inference in affirming judgment as a matter of law for defendant employer]; cf. Lowe v. J.B. Hunt Transport, Inc., supra, 963 F.2d at pp. 174-175 [applying same actor inference in affirming directed verdict for employer].)
[**] See footnote *, ante.
[14] In the court below, the parties devoted considerable effort to briefing whether Harvey's wrongful termination claims are preempted by federal labor law. (See Grant-Burton v. Covenant Care, Inc. (2002) 99 Cal. App.4th 1361, 1378, 122 Cal.Rptr.2d 204, fn. 2 (Grant-Burton) [noting that federal law may preempt such wrongful termination claims in certain circumstances].) The trial court did not address this issue, and the parties scarcely mention it in their briefs in this court. We note, however, that the question of preemption is jurisdictional and cannot be waived. (Ibid., citing International Longshoremen's Ass'n v. Davis (1986) 476 U.S. 380, 387-393, 106 S.Ct. 1904, 90 L.Ed.2d 389.) Because we hold that neither of Harvey's claims of wrongful termination in violation of public policy meets the substantive requirements of California law, we need not determine whether Harvey's claims arguably fall within the protections of federal law.
[15] Labor Code section 232.5 provides in pertinent part: "No employer may do any of the following: [¶] ... [¶] (c) Discharge, formally discipline, or otherwise discriminate against an employee who discloses information about the employer's working conditions."
[16] Labor Code section 232 provides in pertinent part: "No employer may do any of the following: [¶] ... [¶] (c) Discharge, formally discipline, or otherwise discriminate against an employee who discloses the amount of his or her wages."
[17] Sybase argues that Harvey could not have "disclosed" the amount of her wages to Van der Vorst in any event, because, as Sybase's CFO, Van der Vorst either knew how much Harvey earned or had access to her salary information. Sybase contends that to constitute a disclosure within the meaning of Labor Code section 232, the employee must reveal his or her wages "to someone who was unaware of or has no access to the amount of the wages disclosed." We need not address this argument because it is undisputed that Harvey never discussed the amount of her wages with Van der Vorst. We likewise decline to address Sybase's contention that the disclosures protected by section 232 do not include what Sybase calls "compensation `discussions' (... with managers or corporate officers)."
[18] Like Harvey's claim under Labor Code section 232, her claim that she disclosed "working conditions" is based on her conversation with Van der Vorst. As Harvey's counsel explained at the hearing on Sybase's motion for nonsuit, Harvey had "talked to ... Van der Vorst about her demotion which resulted in a change of her duties, a change of her pay, a change of her working conditions, the terms of her employment. She talked to ... Van der Vorst about the difficulty of working with ... White-Ivy and the environment in HR." In this court, Harvey states that the factual support for this claim was "evidence that she had told ... Van der Vorst about White-Ivy's erratic, dysfunctional and demoralizing management style and about poor morale in the HR department."
[19] Sybase disputes both that Harvey's internal complaint to Van der Vorst "disclose[d] information" within the meaning of Labor Code section 232.5 and that her complaint concerned "working conditions." These terms might well be susceptible to more than one interpretation, but because we resolve Harvey's appeal on this point on a different ground, we need not define the precise extent of their reach.
[***] See footnote *, ante.
[] Retired Associate Justice of the Court of Appeal, First District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.