Filed 12/15/15  Warehime v. Farmers Ins. Exchange CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SHARRON WAREHIME, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> FARMERS INSURANCE EXCHANGE, <br><br> Defendant and Appellant. | F068843 <br><br> (Super. Ct. No. 08CECG02976) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

Tharpe & Howell, Christopher S. Maile, Stephanie Forman; Greines, Martin, Stein & Richland, Robert A. Olson and Gary J. Wax for Defendant and Appellant.

Wanger Jones Helsley, Patrick D. Toole, Christine J. Levin, Dylan J. Crosby; and Christine J. Levin for Plaintiff and Appellant.

-ooOoo-

Farmers Insurance Exchange (Farmers) challenges the jury verdict against it on the age discrimination, retaliation and disability related causes of action brought by

Farmers' former employee, Sharron Warehime. According to Farmers, these causes of action are not supported by substantial evidence. Farmers additionally argues that the trial court erred in awarding prejudgment interest and using an attorney fee multiplier. Warehime challenges the trial court's failure to award postjudgment attorney fees.

The record does not support the verdict on the retaliation cause of action. However, the remaining causes of action are supported by substantial evidence. Further, the trial court erred in awarding prejudgment interest to Warehime. However, the trial court did not abuse its discretion in making the attorney fee award. Accordingly, the verdict on the retaliation cause of action and the award of prejudgment interest will be reversed. In all other respects, the judgment will be affirmed.

## BACKGROUND

In 2002, Farmers began to transition its insurance claims adjusting process from a paper based system to the customer restoration network (CRN), a centralized computer system. Farmers hired Warehime, an experienced adjuster, to resolve leftover paper file claims. This was a temporary job that would end when the paper files were adjusted. At that time, Warehime was 56 years old.

Warehime adjusted paper files at three different Farmers offices. During this period, Warehime received very positive performance reviews. For example, Warehime's first supervisor described Warehime as having good decisionmaking skills and the ability "to relate to people and make them feel comfortable." This supervisor rated Warehime as "outstanding" in the categories of "personal development, decision-making initiative, gathering and analyzing information, oral expression, written expression, adaptable to change, observing rules, identifying of strengths and weaknesses, identification of root causes, and handling special assignments." The supervisor found no area in which Warehime needed improvement. Moreover, in July

2002, six months after she began at Farmers, Warehime received a superior service award.

In August 2003, while still handling paper files, Warehime was again given a positive performance review with no areas needing improvement. Warehime's supervisor noted Warehime "makes good decisions, is responsive to management and understands the importance of a project or duty when given a special assignment. Her completed work is documented and handled within company guidelines. She has always been courteous and willing to help the team effort when asked to do so."

After all the paper files were completed, Warehime was assigned to a permanent position at the Fresno office to work as a computer-based adjuster. Warehime reported for work in September 2003 and within a week or so, she received two days of training on CRN.

At the Fresno office, Warehime was one of two adjusters handling the attorney-represented claims, i.e., the injured party was represented by counsel. The other attorney-represented claims adjuster was Nicholas McGuire.

The adjusters were supervised by branch claims supervisors. During Warehime's tenure, the Fresno office had two branch claims supervisors, Nancy Heins and Jim Cavanaugh. Heins was about the same age as Warehime and was her direct supervisor. Above the branch claims supervisors was the branch manager. At the beginning of Warehime's employment, Mark Burger was the branch manager. Thereafter, John Perkins was the branch manager. Mike Smith was the division manager and oversaw four valley offices, including Fresno.

Every claims adjuster is required to comply with the Department of Insurance (DOI) regulations. Under these regulations, a claims adjuster must: respond within 15 days to "any communication received from a claimant, regarding a claim, that reasonably

suggests that a response is expected"; accept or deny a claim within 40 days or request additional time if required; and pay the claim within 30 days of settlement.

Claims adjusters employed by Farmers must also follow Farmers' internal policies. Upon receipt of a new attorney-represented file, a Farmers claims adjuster is required to: (1) advise the attorney that he or she was in receipt of the claim; (2) review the claim; (3) set reserves for the estimated value of the claim; (4) investigate the claim to establish coverage and fault; (5) talk to the insured; (6) if possible, discuss the injuries with the claimant; and (7) document all stages of the file handling in the CRN computer system. Claims adjusters must also maintain a "diary," an electronic reminder to either review a file or complete a task.

To evaluate the value of a bodily injury claim, Farmers adjusters use a computer program called Colossus. The adjuster inputs information regarding the claim and Colossus generates a settlement range. However, Colossus is only a tool, not a substitute for the adjuster's judgment.

In February 2004, Warehime received a small caseload. However, by March 2004, Warehime's caseload had increased to over 200 units, i.e., claims. Many of these units Warehime inherited from another adjuster who had been terminated by Farmers. Warehime's supervisors acknowledged that Warehime's workload was challenging.

During 2004, Heins created various development plans for Warehime. Heins met with Warehime regularly to provide feedback.

In March 2004, Heins remarked that Warehime had made strides to improve her work product and was working a very large inventory. However, Heins noted that Warehime needed to improve on completing activities and meeting DOI time constraints.

By June 2004, Warehime had reduced her caseload from 200 units to 140 units, a 30 percent drop. On June 30, 2004, Warehime received notice that she had received a superior service award based on the "exceptional customer service" she had provided on

4.

a claim. The Farmers national manager commended Warehime on her "outstanding effort" and noted that she had set an example that her peers should follow.

In a July 2004 performance review, Heins stated that Warehime exceeded expectations on the application of comparative negligence. Nevertheless, Warehime was rated below expectations on file documentation and DOI regulatory compliance.

In January 2005, claims adjuster Dick Sanderson went on medical leave. Warehime was assigned a number of Sanderson's units. Around April 2005, McGuire got married and was out of the office for a few weeks. During that time, the majority of the attorney-represented cases that came in were assigned to Warehime.

In mid-January 2005, Heins gave Warehime her first year-end performance review. Heins acknowledged that Warehime had come a long way in 2004. However, while Warehime met expectations in most areas, she still needed to improve on quality assurance and regulatory compliance.

Heins presented Warehime with a performance and development plan and review in May 2005. Heins acknowledged that Warehime had received additional bulk assignments from Sanderson and McGuire. Nevertheless, Heins criticized Warehime's settlement efficiency, noting that it was declining and her inventory was growing quite large. Additionally, Warehime's file quality was below expectations.

Warehime disagreed with the May 2005 evaluation. Warehime explained that she had the largest inventory in the Fresno office. According to Warehime, the volume of files she received because of Sanderson's medical leave and McGuire's extended vacation was the problem, not her efficiency.

After receiving this evaluation, Warehime requested a meeting pursuant to Farmers' "open door" policy. In mid-May 2005, Warehime met with Heins, branch manager Perkins and division manager Smith. Warehime expressed her concern about receiving a higher volume of unit assignments than the other adjusters. Warehime

explained that the size of her case load negatively impacted the quality of her work. Smith confirmed that Warehime had a disproportionately high case load. Farmers acknowledged the need to balance the unit assignments and to work with Warehime to reduce her case load. However, no such efforts were ever made.

In late September 2005, Heins sent a memo to Warehime outlining a development plan and explaining the areas of her job performance that needed to be improved. These areas were: meeting the DOI time constraints; carefully reviewing demand packages and properly using Colossus to determine settlement ranges; documenting the files by showing the thought processes and reasoning for settlement offers; and settlement efficiency. Warehime was informed that these areas would be monitored weekly and that failure to meet these expectations could result in progressive discipline.

On October 3, 2005, Warehime and Heins met to discuss this development plan. Heins took notes and typed them.

When Heins presented the development plan, Warehime responded that her case load was too big and Farmers was harassing her. Warehime said she believed she had been unfairly treated as to case load and that files had not been equitably assigned in the office. Warehime further complained that Heins micro-managed and gave her too many activities to keep up with. According to Warehime, Heins nitpicked her files.

At trial, Warehime testified about her thought processes during the October 3, 2005 meeting as follows:

> "I was trying to explain that I needed the time to bring them down, and [Heins] didn't seem to, in my mind, understand that or agree with that. And as I was trying every way to explain it, it was very frustrating, and finally I just sort of stopped and, you know, re-analyzed the conversation in my head of why wasn't she understanding, this was so confusing, you know. And it hit me that that wasn't really the problem. [¶]…[¶]

> "All of a sudden it just – [I] just seemed to understand that the reason for the anger, and the yelling at me, and the constantly telling me to do things that were done, or the telling me to shut up in the middle of a

6.

meeting, no one wanted to hear what I had to say. [¶]…[¶] All the comments around the office, and the hostile environment and everything, and the teasing of other people, it made sense to me that this was a situation where I was being treated differently, and the workload was only the tool that was used to accomplish it."

Warehime explained that when she said she was "treated differently" she meant she "was being judged by different standards," and "was supposed to accomplish different things" because she "was older and of the old school." However, Warehime did not articulate these thoughts.

Following the October 3, 2005 meeting, Perkins asked Heins to prepare a formal warning letter to Warehime. A formal warning is the first step in progressive discipline.

Heins presented Warehime with the formal warning in mid-December 2005. Heins acknowledged that there had been some improvement in inventory reduction but concluded that Warehime's progress in bringing her files current was unacceptable. The warning then outlined a few examples of Warehime's file handling deficiencies. Warehime testified that she was totally confused by this formal warning and that the alleged deficiencies were not correct.

Over the next month, Warehime exhibited some improvement in her file handling and Heins extended the formal warning period for an additional 60 days. Nevertheless, Heins continued to find Warehime's job performance unacceptable.

On February 28, 2006, Warehime was placed on probation. Smith approved this escalation in discipline based on information provided by Perkins and Heins.

Warehime was presented with the probation memo at a meeting with Heins and Cavanaugh. Heins went over the contents of the memo and explained the various deficiencies that had been identified in certain of Warehime's files.

Warehime became visibly upset and emotionally distraught. Warehime left the office and immediately sought medical attention. She was referred to the psychology department and placed on medical leave.

7.

One or two days later, Warehime telephoned Heins and informed her that she had been placed on medical leave. Thereafter, Farmers received the medical leave documentation by fax.

While Warehime was on leave, Farmers decided to terminate her.

Warehime was released to return to work on June 12, 2006. As an accommodation, Warehime asked to work part-time for two weeks. However, when Warehime arrived at work, there was a young man sitting at her desk. Perkins and Smith immediately took Warehime to a small room, handed her a termination letter and told her she was terminated effective immediately.

Warehime filed the underlying complaint under the California Fair Employment and Housing Act (FEHA) alleging causes of action for age discrimination, retaliation, failure to provide a reasonable accommodation, and failure to engage in an interactive process. (Gov. Code, § 12900 et seq.) The jury found in favor of Warehime on all four causes of action. Warehime was awarded $749,999 in damages.

Thereafter, the trial court awarded Warehime $696,576.50 in attorney fees and applied a 1.25 multiplier increasing the attorney fees award to $870,720.63. The court also granted Warehime's request for prejudgment interest under Civil Code section 3291.

## DISCUSSION

1. ***Farmers' appeal.***

   ***a. Substantial evidence supports the jury's age discrimination finding.***

   A prima facie case of discrimination under the FEHA generally requires the employee to provide evidence that (1) he or she was a member of a protected class; (2) he or she was qualified for the position sought or was performing competently in the position; (3) he or she suffered an adverse employment action, such as termination; and (4) some other circumstance suggests discriminatory motive. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355 (*Guz*).)

Here, it is undisputed that Warehime was a member of a protected class and suffered an adverse employment action, i.e., she was 60 years old and was terminated. In dispute is whether Warehime was performing competently and whether Farmers had a discriminatory motive. To demonstrate a "discriminatory motive," Warehime was required to prove that her termination was "substantially motivated" by her age. (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 230-231 (*Harris*).)

To prevail on a discrimination claim, the employee must prove that the decisionmakers had discriminatory intent. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 539.) Although the ultimate decisionmaker may be innocent of discriminatory intent, the employer can still be liable if the discriminatory comments were made by an employee who can influence the decisionmaker. (*Id.* at p. 542.) Nevertheless, Government Code section 12940, subdivision (a), does not outlaw discriminatory thoughts, beliefs, or stray remarks that are unconnected to employment decisionmaking. Rather, it prohibits discrimination that causes the decisionmaker to discharge the employee. (*Harris, supra*, 56 Cal.4th at p. 231.)

Warehime did not present any direct evidence of discriminatory remarks made by a decisionmaker. However, an employee may rely on inferential proof that a decisionmaker had discriminatory intent. (*West v. Bechtel Corp.* (2002) 96 Cal.App.4th 966, 980.) Nonetheless, "there must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions." (*Guz, supra,* 24 Cal.4th at p. 361.)

Farmers argues there is no substantial evidence to support the jury's finding that Warehime was discharged because of her age. According to Farmers, the allegedly discriminatory remarks relied on by Warehime could not have influenced the decisionmakers. Farmers further contends it had legitimate business reasons for terminating Warehime's employment.

9.

In reviewing the sufficiency of the evidence, the power of this court begins and ends with a determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, to support the jury's findings. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) We must view the whole record in a light most favorable to the judgment, resolve all conflicts in Warehime's favor and give Warehime the benefit of every reasonable inference. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633.) We may not substitute our view of the correct findings for those of the jury. Instead, we must accept any reasonable interpretation of the evidence that supports the jury's decision. Nevertheless, we may not defer to that decision entirely. Substantial evidence is not synonymous with *any* evidence. To be considered "substantial," the evidence must be reasonable in nature, credible, and of solid value. It must actually be "substantial" proof of the essentials that the law requires in a particular case. (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 389.)

Warehime asserts that "Fresno was a 'young' and 'hip' office that did not want older employees." According to Warehime, the record supports this characterization through evidence of offensive age-related remarks that were made by Farmers' employees and condoned by their supervisors. Warehime further points to the promotions of certain young employees and demotions of two older employees. Warehime also notes that she was replaced by a much younger man.

Warehime's co-workers regularly made age-related remarks. Warehime testified that McGuire started a running "joke" that Sanderson was urinating all over walls and floors in the bathroom due to his age. These comments were repeated multiple times in front of the entire office. One supervisor, Cavanaugh, heard McGuire's comments about urine being on the floor.

Employees at the Fresno office also teased older employees about their age. Warehime testified she was repeatedly called "old school." Gary Klitz was called "grandpa" and Sanderson was called "pop," nicknames that identified them as old. Employee Maria Rocca often called Sanderson an "old fuddy-duddy." When Sanderson transferred to the Fresno office, Rocca stated she did not want him there because he just did not fit in with the young, hip office. Again, these comments were made in the open office in front of everyone, including supervisors.

Farmers asserts that these arguably age-related comments made by Warehime's co-workers cannot be imputed to the decisionmakers. However, the office was completely open without any sort of dividers. Warehime's supervisor, Heins, sat close to Warehime. Thus, it is reasonable to infer that, at the very least, the branch claims supervisors, Heins and Cavanaugh, were aware of the age-related comments. Heins and Cavanaugh reported to the branch manager regarding the employees they supervised.

Smith, the division manager, testified at trial that these age-related comments were inappropriate and that any supervisor who became aware of such comments should have reported them. No such reports were ever made. Accordingly, it is reasonable to infer that the supervisors who either influenced or made the personnel decisions condoned the age-related comments.

This conclusion is further supported by evidence that Burger, the branch manager at the beginning of Warehime's tenure, did not take any action in response to certain employee complaints. When an employee anonymously complained about an e-mail the employee found offensive, Burger responded that the employee needed to get a sense of humor. The need for employees to "get a sense of humor" became a running joke.

Farmers additionally notes that Heins, Warehime's immediate supervisor, was about the same age as Warehime. According to Farmers, this evidence supports the conclusion that the Farmers decisionmakers did not discriminate against Warehime based

on her age. However, at the time she retired, Heins was no longer a branch claims supervisor. She was a claims representative, a step down from her previous position. Similarly, Cavanaugh, who was a branch claims supervisor for 17 years, was a claims representative at the time of trial. These position changes support the jury's finding of age bias on the part of Farmers decisionmakers.

When Warehime returned to work on June 12, 2006, Reed Clinton, who was 25 to 30 years old, was sitting at Warehime's desk. Being replaced by a significantly younger person provides additional inferential support for an age discrimination claim. (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 322-323.) Perkins initially testified that Clinton could not have replaced Warehime due to Clinton's lack of experience. However, Perkins admitted he requested that two new employees be hired to replace Warehime, who was out on leave, and McGuire, the other attorney-represented adjuster who was entering management training. Clinton was the person hired in response to Perkins's request. Thus, the jury could have reasonably concluded that Clinton was hired to replace Warehime.

In sum, viewing the record in a light most favorable to the judgment, resolving all conflicts in Warehime's favor and giving Warehime the benefit of every reasonable inference, substantial evidence supports the jury's findings on the age discrimination cause of action. Based on the pervasive age-related comments, the open office configuration, the position changes of two older supervisors, and the hiring of a significantly younger replacement employee, the jury could reasonably infer that Warehime's age was a substantial motivating reason for Farmers' decision to discharge her.

Farmers argues it had a legitimate business reason to discharge Warehime and the jury's contrary finding is unsupportable as a matter of law. Therefore Farmers asserts, at

a minimum, the judgment on Warehime's age discrimination claim must be reversed for retrial on the mixed-motive issue.

In the formal warning, probation memo, and termination letter, Farmers set forth its justifications for the various disciplinary actions through written criticisms of Warehime's work. Each side spent significant trial time discussing and dissecting these critiques. Although Warehime admitted to making a few of the listed errors, much of the criticism of her work was discredited. Thus there was conflicting evidence on the issue of whether Farmers had a legitimate business reason to discharge Warehime. Resolving these conflicts in Warehime's favor, the jury's finding that Farmers did not have a legitimate business reason to discharge Warehime is supported by substantial evidence.

**b. *Substantial evidence supports the jury's findings on the disability related claims.***

Unlawful employment practices include an employer's failure to make reasonable accommodation for an employee's known physical or mental disability. (Gov. Code, § 12940, subd. (m).) The essential elements of such a claim are: (1) the employee has a disability covered by the FEHA; (2) the employee can perform the essential functions of the position; and (3) the employer failed to reasonably accommodate the employee's disability. (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1192.) The covered disabilities include "any mental or psychological disorder or condition … that limits a major life activity." (Gov. Code, § 12926, subd. (j)(1).)

The FEHA also imposes a duty on the employer to engage in a timely, good faith interactive process with an employee to determine an effective reasonable accommodation when an employee with a known mental disability requests one. (Gov. Code, § 12940, subd. (n).)

The failure to accommodate and the failure to engage in the interactive process are separate, independent claims involving different proof. The interactive process is to

determine what accommodation is required. Once a reasonable accommodation has been granted, the employer has a duty to provide such reasonable accommodation. (*A.M. v. Albertsons, LLC* (2009) 178 Cal.App.4th 455, 463-464.)

The jury found that Farmers failed to provide reasonable accommodation for Warehime's mental disability and that Farmers failed to participate in a timely, good faith interactive process with Warehime to determine whether reasonable accommodation could be made.

Warehime claimed a mental disability based on job related stress and depression. In support of this claim, Warehime's medical records from her treatment with Dennis Lewis, Ph.D., were admitted into evidence. Dr. Lewis's notes state he diagnosed Warehime with "AXIS I: Depression NOS."

The parties stipulated to Dr. Lewis's records being admitted into evidence. However, Dr. Lewis was not called as a witness to lay a foundation for these records.

Farmers moved to strike Dr. Lewis's records on the ground that its stipulation to admit those records was based on mistake and excusable neglect. Farmers explained that it entered into the stipulation upon the representation of Warehime's counsel that Dr. Lewis would be called to testify. However, no such condition for admission of the records is contained in the record.

The trial court denied Farmers' motion to strike the medical records. The court noted that Farmers had stipulated to the admission of those exhibits and the court was not going to strike them based on whatever reason the mistake was made. The court further ruled that Farmers was not prejudiced by Dr. Lewis's failure to testify because Dr. Lewis's notes stated a diagnosis of depression and, if called to testify, Dr. Lewis would have repeated what was in his notes.

Farmers argues the trial court erred in allowing the foundationless medical records to stay in evidence. According to Farmers, the records were hearsay. Farmers further

asserts that, without the doctor's foundation and testimony, the jury was left with a diagnosis of "depression NOS" without an explanation of what that means.

However, Farmers stipulated, on the record, to the admission of the medical records. Parties have the right to stipulate to the admission of evidence that would otherwise be inadmissible. (*County of Alameda v. Risby* (1994) 28 Cal.App.4th 1425, 1430.) Such a stipulation precludes objection to evidence that has been agreed on. (*Ibid.*) Accordingly, the trial court did not err when it permitted the medical records to stay in evidence.

Before an employer can be liable for failure to reasonably accommodate an employee's disability, the employer must be aware of the specific disability. (*Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1252.) While the initial burden rests on the employee to identify the disability and resulting limitations, the employer's knowledge of the disability can be inferred from the circumstances. (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1013 (*Scotch*); *Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 237.)

The jury found that Farmers knew of Warehime's mental disability that limited her ability to work. Farmers contends this finding is not supported by substantial evidence. According to Farmers, Warehime failed to present any evidence that her employer knew about her depression.

Warehime suffered an emotional breakdown when she was placed on probation on February 28, 2006, and left the office. One or two days later, Warehime informed Heins by telephone that she had been placed on medical leave. Shortly thereafter, the note from Warehime's doctor placing her on medical leave and excusing her from work was received by Farmers.

Viewing the evidence in the light most favorable to the judgment and giving Warehime the benefit of every reasonable inference, substantial evidence supports the

jury's finding. Farmers was aware that Warehime left the office emotionally distraught and that she was almost immediately placed on medical leave and excused from work. From these circumstances, the jury could reasonably infer that Farmers knew that Warehime had a mental disability.

With regard to a claim for failure to engage in the interactive process, the burden is on the employee to suggest a reasonable accommodation that was available at the time the interactive process should have occurred. (*Scotch, supra,* 173 Cal.App.4th at pp. 1013, 1019.) Further, the employee must prove the requested "reasonable accommodation" would have enabled her to perform the essential functions of the job. (*Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 978.)

Warehime requested part-time work for two weeks. Reasonable accommodations include part-time work schedules. (*Swanson v. Morongo Unified School Dist.* (2014) 232 Cal.App.4th 954, 969.)

Farmers argues Warehime did not meet her burden to prove the part-time accommodation would have enabled her to perform the essential functions of the job because she was never able to competently perform her essential job functions when she was working full time. According to Farmers, there is no evidence that working part-time for two weeks would have corrected Warehime's repeated violations of company policy and DOI regulations or that part-time was reasonable given the job's required workload.

However, the jury found otherwise. The jury first concluded that Farmers did not have a legitimate business reason to discharge Warehime, i.e., she was competently performing her job. As discussed above, substantial evidence supports this finding. The same evidence supports the jury's finding that Warehime could have performed the essential job duties working part-time for two weeks. The jury found Warehime was able to do the job before she went on leave and thus the jury could reasonably infer that she

16.

could have completed the essential tasks after returning from leave working part-time for two weeks.

### c. The jury's retaliation finding is not supported by the record.

Under Government Code section 12940, an employer may not discharge an employee because the employee opposed the employer's unlawful conduct. Such unlawful conduct includes discrimination based on age. (Gov. Code, § 12940, subds. (a) & (h).)

Farmers argues Warehime failed to establish that she complained of *age-related* harassment and unequal treatment and therefore did not prove a critical element of her retaliation cause of action, i.e., that she was discharged because of an age-related complaint. Farmers further asserts that the jury never found, because it was not asked to find, that Warehime's complaints were age-related. In other words, the jury was not properly instructed on the elements of a retaliation cause of action.

To establish a prima facie case of retaliation, an employee must show "(1) he or she engaged in 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).) For the employee to show the required causal link, there must be evidence the employer knew the employee engaged in protected activity. (*Id.* at p. 1046.) If the employer is unaware of the employee's protected activities or attributes, it cannot be liable for retaliation. (*Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 107.)

To prove retaliation, the employee need not have told the employer explicitly and directly that he or she believes the employer is engaging in discrimination. (*Yanowitz, supra,* 36 Cal.4th at p. 1046.) Nevertheless, "an employee's unarticulated belief that an employer is engaging in discrimination will not suffice to establish protected conduct for the purposes of establishing a prima facie case of retaliation, where there is no evidence

17.

the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in discrimination." (*Ibid*.) While an employee is not required to use legal terms or buzzwords when opposing discrimination, complaints about personal grievances or vague or conclusory remarks will not suffice. (*Id*. at p. 1047.) "'The relevant question … is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.'" (*Ibid*.) Where the record is devoid of evidence that the employee ever complained to anyone about the alleged unlawful discrimination or did anything to imply that unlawful discrimination was an issue, a retaliation claim fails. (*Villanueva v. City of Colton* (2008) 160 Cal.App.4th 1188, 1199.)

Warehime's retaliation claim is based on the October 3, 2005, meeting with Heins. At that meeting, Warehime complained that she was being harassed and unfairly treated. According to Warehime, Heins was micro-managing and nitpicking Warehime's files.

Warehime testified that during this meeting she came to the realization that she was being discriminated against because of her age. However, there is no evidence that she ever conveyed this thought to Farmers. Rather, Warehime complained that her workload was excessive. She claimed she was being subjected to generic harassment and unequal treatment but did not tie those complaints to any unlawful conduct.

The trial court noted this absence of evidence when the parties were discussing CACI No. 2505, the jury instruction that sets forth the essential factual elements of a retaliation cause of action. CACI No. 2505 provides, in part:

> "[Name of plaintiff] claims that [name of defendant] retaliated against [him/her] for [describe activity protected by the FEHA]. To establish this claim, [name of plaintiff] must prove all of the following:
>
> "1. That [name of plaintiff] [describe protected activity]; …" (*Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1229.)

18.

The court observed that Warehime did not base her complaint on age during the October 3, 2005 meeting. Accordingly, the court did not include age or any other "activity protected by the FEHA" and instead instructed the jury that Warehime's retaliation cause of action was based on her "complaint of harassment and unequal treatment." However, general harassment and unequal treatment is not unlawful under the FEHA. Rather, to be unlawful, the discrimination must be based on "race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status." (Gov. Code, § 12940, subd. (a).) Therefore, the jury was incorrectly instructed on the elements of a retaliation cause of action. Moreover, the record is devoid of evidence that Warehime ever complained or implied to Farmers that she was being discriminated against for an unlawful reason, i.e., her age. Thus, the verdict on the retaliation cause of action must be reversed.

### d. A new trial on noneconomic damages is not required.

As discussed above, the verdict on the retaliation claim, one of the four causes of action, must be reversed. Relying on *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686 (*Roby*), Farmers argues that the reversal of any cause of action requires a new trial on the noneconomic damages.

In *Roby*, a wrongful termination case, the jury was instructed to determine one amount for the economic damages for all causes of action. However, for the noneconomic damages, the jury was instructed to determine the appropriate amount applicable to each of the three theories of recovery because that amount could vary for each theory. Accordingly, the jury awarded different amounts of noneconomic damages for each theory of recovery, wrongful termination in violation of public policy, discrimination, and failure to accommodate.

19.

The Court of Appeal in *Roby* concluded that the noneconomic recovery on each cause of action overlapped, at least in part, and therefore had the effect of compensating the employee multiple times for the same injury. (*Roby, supra,* 47 Cal.4th at p. 703.) The California Supreme Court agreed noting that the jury's intent in making its noneconomic damages awards could not be determined to a reasonable certainty. Nevertheless, the court did not remand for a new trial on damages because the employee agreed to withdraw her challenge on this issue. (*Id.* at p. 705.)

Here, unlike in *Roby,* the jury was instructed that each item of damages could only be awarded once regardless of the number of theories alleged and that it was to determine one amount for noneconomic damages. Thus Warehime was not compensated multiple times for the same injury and the jury's intent in making the award is not ambiguous. Further, all the causes of action stem from Farmers' discipline and termination of Warehime. In other words, each theory of liability relates to the same wrong. Therefore, the reversal of the retaliation cause of action does not require retrial of the noneconomic damages award.

### e. The trial court erred in awarding prejudgment interest.

Civil Code section 3291 authorizes prejudgment interest in "any action brought to recover damages for personal injury" if the defendant fails to accept an offer to compromise pursuant to Code of Civil Procedure section 998 and the judgment exceeds the amount of the compromise offer. (*Gourley v. State Farm Mut. Auto. Ins. Co.* (1991) 53 Cal.3d 121, 125 (*Gourley*).) Whether Civil Code section 3291 applies depends on the primary purpose of the cause of action. (*Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 1002 (*Bihun*), disapproved on an unrelated ground in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664.) If the action is brought primarily to recover an economic loss, prejudgment interest is not available. This is so even if the plaintiff sought emotional distress as well as economic damages. (*Gourley,*

*supra,* 53 Cal.3d at p. 129.)  However, if the action seeks to vindicate decidedly personal rights, prejudgment interest can be awarded.  (*Bihun, supra,* 13 Cal.App.4th at p. 1005.)

Here, the trial court concluded that Warehime suffered "more an emotional injury than just simply economic" and awarded prejudgment interest.  Farmers argues that a wrongful termination case such as this is brought primarily to recover an economic loss and therefore the trial court erred.  Farmers is correct.

The trial court relied on *Bihun* in making the prejudgment interest award.  There, however, the action was based on workplace sexual harassment.  As the *Bihun* court noted, sexual harassment is the invasion of a personal right, a "'form of violence against women.'"  Thus, the court concluded, the principal injury was personal, not economic. (*Bihun, supra,* 13 Cal.App.4th at p. 1005.)

However, Warehime's complaint sought damages due to being wrongfully terminated by Farmers.  The primary purpose of Warehime's action was to be compensated for the economic loss caused by not having a job.  The nature of such a wrongful termination tort is to recover for the infringement of property rights, not personal injury.  (*Holmes v. General Dynamics Corp.* (1993) 17 Cal.App.4th 1418, 1436.)  The fact that Warehime sought and received damages for emotional distress does not change the nature of her complaint.  Accordingly, the trial court erred in awarding prejudgment interest.

### f. The trial court did not abuse its discretion in applying an attorney fee multiplier.

The trial court may award attorney fees to the prevailing party under Government Code section 12965, subdivision (b).  Such an award should be fully compensatory and "include compensation for *all* the hours *reasonably spent*, including those relating solely to the fee."  (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1133 (*Ketchum*).)

In calculating a reasonable attorney fee award, the court begins by determining "the reasonable hours spent, multiplied by the hourly prevailing rate for private attorneys in the community conducting *noncontingent* litigation of the same type." The result is known as the "lodestar" figure. (*Ketchum, supra*, 24 Cal.4th at p. 1133.) The court may then adjust the lodestar figure based on a number of factors that weigh in favor of augmentation or diminution. To enhance a fee, a court may apply a multiplier. (*Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1171.)

Warehime filed a motion for attorney fees requesting $747,115.50 as the lodestar with an enhancement multiplier of 1.5. After considering the various billings and Farmers' objections, the trial court made certain deductions and determined the lodestar figure to be $696,576.50. The court then enhanced the award with a multiplier of 1.25 based on "the risk of the case," for a total attorney fee award of $870,720.63.

Farmers first notes that the reversal of any of a plaintiff's theories may require revisiting the attorney fee award. While we are reversing the jury's verdict on Warehime's retaliation cause of action, the attorney fee award need not be reconsidered on this ground. Warehime's claims were factually related and intertwined. In such a situation, fees are not reduced when a plaintiff prevails on fewer than all of the claims. (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989.)

Farmers does not dispute the reasonableness of the lodestar figure awarded by the trial court. Rather, Farmers objects to the court's use of a multiplier to enhance the award. Farmers argues the lodestar amount adequately compensates counsel. According to Farmers, a multiplier is not warranted because there were no novel or complex legal issues, Warehime's counsel did not display an exceptional degree of skill and expertise, and counsel did not turn down other cases to work on this one. Farmers further asserts that the contingent fee risk of non-recovery does not justify the multiplier.

22.

We review a trial court's award of attorney fees for abuse of discretion. (*Robbins v. Alibrandi* (2005) 127 Cal.App.4th 438, 452.) "The 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.'" (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49 (*Serrano*).) Accordingly, our review must be highly deferential to the views of the trial court. (*Nichols v. City of Taft* (2007) 155 Cal.App.4th 1233, 1239 (*Nichols*).) Thus, the award will be upheld unless there is no reasonable basis for the court's action. (*Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 621 (*Ramos*).)

Here, the trial court applied a multiplier based on counsel's risk of not being paid the contingent fee. In his declaration, Warehime's counsel further explained that he took over the case after discovery was already closed and thus the risk inherent in a contingent fee case was substantially increased because he was unable to conduct his own discovery.

It has long been recognized that a fee enhancement may be reasonable in a contingent case. (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 394-395.) Since a contingent fee contract involves a gamble on the result, it may provide for a larger compensation than would otherwise be reasonable. (*Ketchum, supra,* 24 Cal.4th at p. 1132.) The economic rationale for such fee enhancement is that the contingent fee compensates the lawyer not only for the legal services he or she renders but for the loan of those services. "'The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of conventional loans.'" (*Id.* at pp. 1132-1133.) Thus, a court awarding attorney fees is permitted to include a fee enhancement for the purpose of compensating the attorney who agreed to undertake such representation at the risk of nonpayment or delayed payment. (*Id.* at p. 1136.)

23.

This being a contingent fee case where the trial attorney took over late in the litigation, we cannot conclude that the trial court had no reasonable basis for using a 1.25 multiplier to enhance the fee. The 1.25 multiplier is relatively modest and is less than requested by Warehime's counsel. Accordingly, the attorney fees awarded to Warehime will be affirmed.

## 2. *Warehime's appeal.*

Following the jury verdict in her favor, Warehime moved for attorney fees. In her reply to Farmers' opposition to this motion, Warehime requested an additional $57,441 in attorney fees incurred since the motion was filed. The trial court did not increase the attorney fee award. Warehime argues the trial court erred in refusing to consider her request.

As discussed above, it is up to the trial judge to determine the value of professional services rendered in his or her court, and the appellate court will not disturb the trial judge's ruling unless convinced that it is clearly wrong. (*Serrano, supra,* 20 Cal.3d at p. 49.) Accordingly, our review is highly deferential and the award will be upheld unless there is no reasonable basis for the court's action. (*Nichols, supra,* 155 Cal.App.4th at p. 1239; *Ramos, supra,* 82 Cal.App.4th at p. 621.)

At the hearing on the attorney fees motion, the following discussion took place between Warehime's counsel and the trial court:

> "[COUNSEL]: The big issue I also wanted to raise, too, with regard to attorneys' fees, Your Honor, was that … since the filing of our attorney fee motion, we incurred another $57,441 in attorney's fees. I wasn't clear whether the Court's award of 696,576, that included that additional work that was –
>
> "THE COURT: That's all of your fees.
>
> "[COUNSEL]: Pardon me?
>
> "THE COURT: That's the entirety of your fees.

"[COUNSEL]: Okay.

"THE COURT: Plus your multiplier, plus whatever you get contingent from the $750,000. A pretty good pay day.

"[COUNSEL]: That's not the way it works, Your Honor, but I appreciate the -- I understand what the Court is saying. So the total award does include the 57,000, so the fee award was reduced from a request of 804,000 to 696,576, is that right?

"THE COURT: Correct."

Thus, contrary to Warehime's position, the trial court did consider her request for the additional $57,441 in arriving at the lodestar figure. Accordingly, the trial court reasonably exercised its discretion in reducing the entire fee request to approximately $697,000.

## DISPOSITION

The jury's finding in favor of Warehime on the retaliation cause of action is reversed. The award of prejudgment interest is reversed. In all other respects, the judgment is affirmed. No costs on appeal are awarded.

_____
LEVY, J.

WE CONCUR:


_____
HILL, P.J.


_____
PEÑA, J.

25.